Docket No.  19-cv-03786 (JMF)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CLARENCE BOWEN ALLEN, BRENDA BERMAN,
ANNETTE BIRDSONG, WILLIAM HENRY, JOSE
JACOB, JACQUELINE KING, SUSAN LAMONICA,
JEAN PHIPPS, ROSLYN PRESS, HERBERT
RICHARDSON, VIRGINIA TUFARO, on behalf of
themselves and all other similarly-situated individuals,

Plaintiffs,

-against-

THE CITY OF NEW YORK and NEW YORK CITY
HEALTH AND HOSPITALS CORPORATION,

Defendants.

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

*Hon. Sylvia O. Hinds-Radix*
*Corporation Counsel of the City of New York*
*Attorney for Defendants*
*100 Church Street*
*New York, N.Y.  10007*

*Of Counsel:  Aliza J. Balog*
*Tel: (212) 356-1104*

*Matter No.:  2019-026404*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES....................................................................................... iii

PRELIMINARY STATEMENT ..................................................................................1

STATEMENT OF FACTS............................................................................................2

            A.  H+H's Transformation and Efficiency Issues.....................................2

            B.  February MEII.......................................................................................4

            C.  Jacobi Implements the February MEII ................................................5

            D.  June MEII..............................................................................................6

            E.  Jacobi Implements the June MEII .......................................................8

            F.  At Least 3 Putative Class Members Have
                Released the Claims.............................................................................10

            G.  Richardson & Birdsong's Claims........................................................10

ARGUMENT ..............................................................................................................11

      I.       ADEA CLAIM NOT SUBJECT TO CLASS CERTIFICATION............11

      II.      PLAINTIFFS FAIL TO SATISFY RULE 23(A). ...................................12

            A.  Plaintiffs Are Unable to Establish
                Commonality Under Rule 23(a)(2) ....................................................12

             (a)  Disparate Impact................................................................................13

                  (i)    No Neutral Policy ..................................................................13

                  (ii)   Dr. Thompson's Analysis Has No
                          Probative Value......................................................................16

             (b)  Disparate Treatment ..........................................................................19

                  (i)    Anecdotal Evidence ...............................................................20

             (c)  Breach of Contract.............................................................................21

             B.  Plaintiffs Are Unable to Establish Numerosity.................................22

**Page**

       C.   Plaintiffs are Unable to Establish Typicality ....................................23

    III.      PLAINTIFFS FAIL TO SATISFY RULE 23(B)(3). ..............................24

CONCLUSION.....................................................................................................................26

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amchem Prods. v. Windsor,*
  521 U.S. 591 (1997) ..................................................................................................... 24, 25

*Ansari v. New York Univ.,*
  179 F.R.D. 112 (S.D.N.Y. 1998) ...................................................................................... 22, 23

*Attard v. City of N.Y.,*
  451 F. App'x 21 (2d Cir. 2011) ........................................................................................ 13

*Bean v. Crocker National Bank,*
  600 F.2d 754 (9th Cir. 1979) ........................................................................................... 12

*Comcast Corp. v. Behrend,*
  569 U.S. 27 (2013) ........................................................................................................... 25

*Cooper v. Southern Co.,*
  390 F.3d 695 (11th Cir. 2004) .......................................................................................... 24

*EEOC v. Gilbarco, Inc.,*
  615 F.2d 985 (4th Cir. 1980) ........................................................................................... 12

*Elisa W. v. City of N.Y.,*
  No. 15-CV-5273 (KMW), 2021 U.S. Dist. LEXIS 167910
  (S.D.N.Y. Sep. 3, 2021)..................................................................................................... 23

*Fitzpatrick v. N.Y. Cornell Hosp.,*
  00 Civ. 8594 (LAP), 2002 U.S. Dist. LEXIS 25166
  (S.D.N.Y. Dec. 13, 2002) ................................................................................................. 15

*Fuller v. Instinet, Inc.,*
  120 Fed. Appx. 845 (2d Cir. 2004 ) .................................................................................. 20

*Gen. Tel. Co. of the Southwest v. Falcon,*
  457 U.S. 147 (1982) ......................................................................................................... 12

*Gilbreath v. Brookshire Grocery Co.,*
  400 F. Supp. 3d 580 (E.D. Tx. Aug. 21, 2019).................................................................. 15

*Glatt v. Fox Searchlight Pictures, inc.,*
  811 F.3d 528 (2d Cir. 2015) ............................................................................................. 24

iii

*Hargett v. Metro. Tr. Auth.*,
552 F. Supp. 2d 393 (S.D.N.Y. 2008), *aff'd on other rounds*,
381 F. App'x 12 (2d Cir. 2010) ................................................21

*Int'l Bhd. of Teamsters v. United States*,
431 U.S. 324, 339 (1977) ................................................20

*Kassman v. KPMG LLP*,
416 F. Supp. 3d 252 (S.D.N.Y. Nov. 30, 2018) ................................................13

*LaChapelle v. Owens-Illinois, Inc.*,
513 F.2d 286 (5th Cir. 1975) ................................................12

*Lusardi v. Xerox Corp.*,
99 F.R.D. 89 (D.N.J. 1983) ................................................12

*Moore v. Publicis Grp. SA.*,
11 Civ. 11279, 2014 U.S. Dist. LEXIS 185384
(S.D.N.Y. May 15, 2014) ................................................24

*New York City Transit Auth. v. Beazer*,
440 U.S. 568 (1979) ................................................16

*Oakley v. Verizon Communs., Inc*,
09 Civ. 9175 (CM), 2012 U.S. Dist. LEXIS 12975
(S.D.N.Y. Feb. 1, 2012) ................................................25

*Osborne v. United Tech. Corp.*,
1977 U.S. Dist. LEXIS 17087 (D. Conn. Mar. 3, 1977) ................................................11

*Reynolds v. Barrett*,
685 F.3d 193 (2d Cir. 2012) ................................................13

*Richardson v. City of New York*,
17 Civ. 9447 (JPO), 2021 U.S. Dist. LEXIS 90822
(S.D.N.Y. May 12, 2021) ................................................*passim*

*Ross v. Nikko Sec. Co. Int'l, Inc.*,
133 F.R.D. 96 (S.D.N.Y. 1990) ................................................20

*Sheehan v. Purolator, Inc.*,
839 F.2d 99 (2d Cir. 1988) ................................................20

*Smith v. City of Jackson*,
544 U.S. 288 (2005) ................................................13, 15

*Smith v. Xerox Corp.*,
196 F.3d 358 (2d Cir. 1999) ................................................17, 18

iv

*Teasdale v. N.Y.C. Fire Dep't,*
    574 F. App'x 50 (2d Cir. 2014) .................................................................. 13, 16

*US v. City of N.Y.,*
    717 F.3d 72 (2d Cir. 2013) ....................................................................... 19, 24

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011) .................................................................... 12, 14, 16, 19

*Wallach v. N.Y.C. Health and Hosp. Corp.,*
    Index No. 156269/2018 (Sup Ct. N.Y. Cnty) ...................................................1

*Watson v. Fort Worth Bank & Trust,*
    487 U.S. 977 (1988) ......................................................................................... 16

**Statutes**

29 U.S.C. § 216 ...................................................................................................... 12

29 U.S.C. § 626(b) ................................................................................................ 11

42 U.S.C. § 1983 ............................................................................................... 13, 19

29 U.S.C. §§ 621 *et seq.* .................................................................................. *passim*

29 U.S.C. §§ 201 *et seq.* ................................................................................. 11, 12

42 U.S.C. § 2000e *et seq* ............................................................................ 10. 13, 19

**Other Authorities**

Fed. R. Civ. P. 23(B)(3) .................................................................................. 24, 25

Fed. R. Civ. P. 23 ............................................................................................. 11, 12

Fed. R. Civ. P. 23(A) ....................................................................................... 12, 23

Fed. R. Civ. P. 23(a)(1) .......................................................................................... 22

Fed. R. Civ. P. 23(a)(2) ................................................................................... 12, 19

5 Moore's Federal Practice § 23.46 ..................................................................... 25

## PRELIMINARY STATEMENT

In recent years New York City Health and Hospitals Corporation d/b/a NYC Health + Hospitals ("H+H") has undergone a transformation from a network of hospitals to one system to better serve and provide health care to New Yorkers.   Commencing in late 2016, as part of H+H's transformation from a network to a system, and to address deep financial challenges, H+H undertook a series of actions to reduce costs and to bring consistency to the hospital's structure and management.   Among those actions, in late-2016/early-2017, the acute care facilities CEOs, including the CEO of NYC Health + Hospitals/Jacobi ("Jaocbi'), were instructed by H+H central management to review their management structures and to identify redundancies in their management structure and positions that were no longer essential to the function of the facility. This first reduction was called the Managerial Efficiency Improvement Initiative ("February MEII").  Later in 2017, H+H determined that it would need to implement a second reduction, the June MEII.  The June MEII differed from the MEII in significant ways, including that it had a target number of reductions, was based on a standardized table of organization, and was implemented by a different composition of employees than had implemented the February 2017.

H+H did not select any managerial positions for inclusion in either the February or June MEII because of the employee who held that position's age or race.[1]   Yet, plaintiffs Annette Birdsong and Herbert Richardson seek certification of a class of "all people who were

---

[1] This case pertains solely to Jacobi.  A separate action is pending in state court, purporting to bring a class action on behalf of all older H+H employees whose managerial positions were selected for elimination in 2017.  *See Wallach v. N.Y.C. Health and Hosp. Corp.*, Index No. 156269/2018 (Sup Ct. N.Y. Cnty).  The plaintiff moved for class certification in that case for a second time in February.

40 years old or older and/or non-white whose employment at Jacobi Medical Center was terminated in 2017 as part of Defendants' policy entitled the Managerial Efficiency Improvement Initiative." Putting aside that less 45 employees had their employment terminated at Jacobi as a result of either MEII and that race and age discrimination claims plainly cannot be brought in one class, there was no singular MEII, and H+H only provided general guidance for them. Even if there was, there is no significant proof of a disparate impact. The statistical analysis of plaintiffs' expert relied on a flawed data set that improperly excluded positions considered for either of the MEII, and included positions that were not. For these reasons, and the additional reasons set forth at length below, plaintiffs' motion for class certification should be denied.

## STATEMENT OF FACTS

### A.   H+H's Transformation and Efficiency Issues

H+H is the largest municipal health system in the United States and serves over one million New Yorkers each year. Def. Ans. ¶ 10, Dkt. No. 24. H+H has 11 acute care facilities, including Jacobi. Starting in 2016, H+H began its transformation from a network of health care facilities to one system to better meet the health care needs of New Yorkers. At the same time, it was projected that H+H would have a budget gap of over $1.8 billion by fiscal year 2020. Fay Dep. (hereafter, "Ex. 1") 98:2-25. H+H's transformation had three pillars: (1) cost containment, (2) revenue growth, and (3) clinical transformation. Ex. 1, 34:8-34. The cost containment pillar included workplace attrition. Ex. 1, 34:23-35:3.

Cost savings targets for the fiscal year 2017 plan needed to be achieved prior to June 30, 2017. Ex. 1, 58:3-8. The fiscal year 2017 plan sought a workforce cost savings of roughly $55 million, in an effort to close the gap, which translated to approximately 1,000 Full Time Equivalent ("FTE") positions, assuming H+H was able to reduce the number of FTEs equally beginning in July of 2016 through June of 2017. Ex. 1, 96:4-22. H+H employees are

either Group 11 or Group 12 employees.  Group 12 employees are represented by labor unions whose terms of employment are covered by collective bargaining agreements.  Ex. 1, 49:22-25; Fay 30(b)(6) Dep. (hereafter, "Ex. 2") 131:6-21.  Group 12 employees are also largely comprised of H+H's frontline staff who provide direct patient care.  Ex. 1, 68:20-72:7; Ex. 2, 94:3-18, 106:10-107:19.  Group 11 employees, on the other hand, are H+H's management employees. Ex. 1, 50:2-4; Ex, 2,  94:3-18.

H+H tried a number of ways to reduce staffing levels that were unsuccessful in achieving the cost savings that H+H needed to achieve, including reducing staffing levels through attrition, a hiring freeze, and an overtime reduction.  Ex. 1, 37:24-:22-40:5.  For example, H+H instituted a hiring freeze in late December 2016 that impacted both Group 11 and Group 12 positions. Ex. 2, 95:2-15.  There was also a targeted attrition program that focused on Group 12 positions.  *Id*.  Throughout, H+H committed to not laying off any Group 12 employees.  Ex. 1, 49: 4-21, 50:5-51:24.

As to H+H's Group 11 management employees, in September 2016, the Boston Consulting Group ("BCG") performed a detailed assessment for H+H.  Ex. 1, 88:19-90:17.  One focus of BCG's work was a spans and layer analysis.  BCG found that H+H had a lot of management layers and that each layer had very narrow spans.  What this meant was that H+H had a lot of managers who were each managing relatively few people, which was not consistent with similar organizations.  *Id*.  Further, over the years, each of H+H's entities had developed different and inconsistent management structures.  Ex. 1, 91:20-92:11. H+H formed a Working Group to address the spans and layers findings from BCG.  Ex. 2, 90:19-92:20.  In March 2017, the Working Group established model Tables of Organization for H+H's acute care facilities.

There was one model for tertiary care facilities like Jacobi and another for H+H's smaller community hospitals.  Ex. 2, 57:16-58:21.

**B.      February MEII**

   In January 2017, H+H determined that it had not achievved the cost savings it needed.  Ex. 1, 37:24-38:17; Ex. 2, 24:6-20.  H+H wanted to focus on making investments on front line staff who were directly involved in patient care and, as a result, it made a decision to that it needed to reduce its management staff.  Ex, 2 24:6-20, 39:11-40:9; *see also* Ex. 1, 36:24-37:5.  This process was referred to as the Managerial Efficiency Improvement Initiative ("February MEII").  *See, e.g.*, February 2017 MEII Selection Criteria, D_003531-32 (hereafter, "Ex. 4").  H+H never had a policy that required it to terminate Group 11 employees in 2017.  Ex. 2, 21:8-22, 88:18-90:18. Rather, it had in place guidance on the reduction of management layers and increases in spans of control that ultimately lead to the elimination of Group 11 positions.  If the employee holding that Group 11 position had an underlying Group 12 title, they could return to that position, if the employee did not, however, then their employment with H+H would be terminated. Ex. 2, 21:8-22:21, 109:8-110:-13.

   The decision to engage in the February MEII included Antonio Martin who was the Chief Operating Officer, Rick Gannotta, who was then the Senior Vice President for the Acute Care Service Line, and Yvette Villanueva from Human Resources, as well as representatives from legal.  Ex. 2, 59:12-16.  In mid-January 2017, H+H asked each of the acute care hospital CEOs to evaluate the positions in their management ranks and to determine whether those positions were required in order for the facility to perform their core operations.  Ex. 2, 43:15-44:8, 67:13-68:2, *see also* Email Dated January 18, 2017, D_003503 (hereafter, "Ex. 3"); Ex. 4.  They were also asked to determine whether the positions might be redundant to another position in the organization.  *Id.*  Finally, they were instructed that that the elimination of the

position could not compromise operational effectiveness or patient safety. *Id*. H+H did not provide the facilities with any type of targets numbers for the reduction. Ex. 2, 44:10-15. It did, however, provide them with instructions that because this was focused on the positions, performance ratings, disciplinary history and time and attendance records could not be used as a part of the review. *See* Ex. 4.

**C.      Jacobi Implements the February MEII**

H+H left it up to each acute care facility to determine which layers of management should be eliminated. Mastromano Dep. (hereafter, "Ex. 5") 39:4-7. William Foley, then CEO of Jacobi, tasked each of his leadership to identify positions in the departments that reported to them for elimination. Ex. 5, 54:6-55:2; Mastromano 30(b)(6) Dep. (hereafter, "Ex. 6") 24:2-25:12. Mastromano, along with Foley, and Suzanne Pennacchio, the Chief Nursing Officer of Jacobi all participated in the decision on which positions should be eliminated.[2] Ex. 6, 24:2-25:12; Pennacchio Dep. (hereafter, "Ex. 7") 28:14-29:25.

Each of the leadership members separately selected positions. Jacobi's leadership looked beyond titles as the titles did not explain the function of the title. For example, an Associate Director of Respiratory Therapy is not the same as an Associate Director of Radiology. Ex. 5, 63:25-64:10. They also took different approaches. Pennacchio reviewed the nursing table of organization. Ex. 7, 30:2-10. She identified two Director level positions: the Director of Nursing in the Staffing office, and the Director of Nursing for Women and Children's Services, held by Susan LaMonica. Ex. 7, 30:11-31:10. Pennacchio selected the Director of Nursing in the Staffing Office because, based on her previous decades of experience, she had worked at places that had nurse staffing offices that never had a director title, plus she knew that

---

[2] Foley, Mastromano, and Pennacchio are all over 40 years old. *See* Ex. 5, 11:21-12:2; Ex. 7 11:9-11; Foley Dep. (hereafter, "Ex. 22") 12:22-23.

the office also had an Assistant Director.  Ex. 7, 32:4-22.  She selected Director of Nursing for Women and Children's Services as Women and Children is Jacobi's smallest component in terms of beds and staff.  But, also, significantly, Pennacchio's own background is in pediatrics and women's health, so she knew she could oversee that department herself.  Ex. 7, 2:4-22.

Ultimately, based on the recommendations of Jacobi's leadership, a list was created of H+H employees whose positions were no longer deemed to be critical to Jacobi's operation.  Ex. 5, 65:15-17.  In the end, Jacobi eliminated 19 positions as part of the February MEII with varying titles in varying departments.  *See* Jacobi Positions Selected in the February 2017 MEII (hereafter, "Ex. 8").   Of the 19 positions selected, 7 were held by employees who have identified as White.  *Id*.  6 identify as Black, 2 identify as Asian, and 4 identify as Hispanic.  *Id*.  All of the employees whose positions were selected were over the age of 40.  *Id*.  Not all employees were terminated. 3 employees who had fall-back titles were able to return to Group 12 roles.  *See* Chart, D_006441 – 42 (hereafter, "Ex. 9").

## D.    June MEII

In March 2017, H+H determined that the results of the February MEII had fallen short of the financial target, and that it needed to engage in a second MEII with more guidance. Ex. 2, 54:7-13, 100:9-101:3.  To this end, the February MEII and June MEII were "related in their intent but they were different in their approach."  Ex. 1, 62:17-63:24; Ex. 2, 96:23-97:22. Specifically, they were related because they both concerned a review of the management structure.  Ex. 1 76:4-11.

But, there were many differences between the February and June MEII. H+H did not develop the standard table of organization in time for, or used as a guide for, the February 2017 MEII.  Ex. 2, 25:8-25; Ex. 6, 22:20-23:3.   For example,  in the standardized table of organization, H+H identified the Senior Associate Director ("SAD") title as particularly  worthy

of consideration, and recommended eliminating it.  Ex. 1, 89:12; *see also* Ex. 10, at Optimized Management Table of Organization, D_004971-81.  Further, unlike the February MEII, for the June MEII, H+H did an analysis of the current management staffing levels at each facility and ultimately decided on a reduction target for each of the individual facilities.  Ex. 1, 99:23-103:21; Ex. 2, 44:16-4-52:9. The reduction targets were FTE targets, not dollar targets.  The two MEIIs also involved different people both at the Central level and, as set forth below, at the facility level.  After the February MEII, H+H and Jacobi went through staffing changes.  Specifically, both Antonio Martin and Rick Gannotta left H+H.  Ex. 2, 61:24-62:8.  And, in March of 2017, William Foley, became the Senior Vice President of Acute Care for all of H+H.  Rosa Colon-Kolacko, the Senior Vice President and Chief People Officer also joined in leading the June MEII. Ex. 2, 62:6-63:2, 103:12-104:11.

Ultimately, on April 6, 2017, H+H met with all of the facility CEOs to discuss the June MEII, including the standardized table of organization and FTE reduction targets.  *See* Email from Fay to CEOs, dated April 4, 2017, D_004968-86 (hereafter, "Ex. 10"); *see also* Ex. 1, 100:2-25; Ex. 2, 68:3-70:7.  H+H presented the management structure to the hospital CEOs as guidance.  Ex.1, 92:25-93::25, 99:23-103:21; Ex. 2, 43:12-14.  The CEOs were instructed that they needed to make steps forward in standardizing their table of organization, but they were not required to strictly follow it.  Ex. 1, 93:2-25; Ex. 2, 75:16-77:8.  H+H felt it was important that the CEOs have flexibility in implementing the June MEII because each of the hospitals were different.  Ex. 2, 44:16-52:9.  As to the SAD title, the facilities were to evaluate their use of that title and to make a decision either that the role should remain, be eliminated, should be  elevated to a Director level or reduced to an Associate Director level.  Ex. 1, 90:5-17.  The CEOs were also instructed that any changes to their management structure could not adversely affect patient

care or compromise the operational integrity of the organization. Ex. 1, 99:23-103:21. Significantly, there was no employee-specific guidance given. Further, H+H was careful not to identify a dollar target because they felt that it would send the wrong message about the focus of the management restructuring. Ex. 1, 117:6-118:3. H+H gave the CEOs and other leaders at the hospitals leeway to select the positions that they felt were best for their facility. Ex. 2, 71:5-72:8, 79:4-82:7; *see also* Ex. 10.

Each acute care entity was to implement the June 2017 MEII on its own. On April 12, 2017, Colon-Kolacko emailed the CEOs with a process to "guide" their review of their managerial staff. *See* April 12, 2017 Email (hereafter, "Ex. 11") D_005250-80. After her communication, H+H Central was not privy to the conversations that the CEOs had with their individual leadership teams. Ex. 1, 103:22-104:23. After the facilities selected positions, the CEOs each had a conversation with Foley and his team just to make sure that there was no adverse effect on patient care. Ex. 2, 79:4-82:7. H+H HR and Legal also reviewed the lists. *Id.*

### E.    Jacobi Implements the June MEII

Mastromano became acting CEO of Jacobi in February 2017 and CEO in May 2017. Ex. 5, 27:20-28:17. After Mastromano attended the April 6 meeting he met with Jacobi's leadership. Ex. 5, 91:7-16. This time, he included Pennacchio, Ellen Barlis, and Joanne Sampson.[3] Ex. 5, 90:15-91:6; Ex. 6, 29:7-13. Mastromano made the decision to include Jacobi's HR Director, Sampson, this time. Ex. 5, 29:7-31:2. Each reviewed the lines that reported to them. Ex. 5, 99:4-100:9; Ex. 6, 31:9-19, 32:19-33:4. Jacobi leadership had to look beyond the job titles to the functions of the title in order to determine if their current positions fit into the standard table of organization. Ex. 6, 81:8-85:9.

---

[3] Mastromano, Pennacchio, Barlis and Sampson are all over the age of 40. *See* Ex. 5, 11:21-12:2; Ex. 7, 11:9-11; Ex. 12, 11:12-13.

Jacobi's leadership did not consult with one another on which positions to select. Ex. 7, 110:4-5.   Each of the leaders took a different approach.   As Pennacchio had already selected Directors for the February MEII and, would  thus not be selecting any Directors for the June MEII, she met with her Directors to select positions for the June MEII.  Ex. 7, 50:18-52:15. She had her Directors look at each of their tables of organization and suggest positions to eliminate. Ex. 7, 59:3-22.  Pennacchio in consultation with her Directors selected three positions for elimination.  Mastromano, on the other hand, did not meet with anyone below him to get their input on which positions to eliminate.   Ex. 6, 91:2-5   Similarly, Sampson testified that she selected all of the positions to eliminate from HR, without consultation of anyone else in HR. *See* Sampson Dep. (hereafter, "Ex. 12") 41:8-43:7.

While Mastromano ultimately had a conversation with Foley about the list of positions to be eliminated at Jaocbi, the conversation was never about specific individuals.  Ex. 5, 109:3-10.  Rather, Foley asked more structural questions about whether there would be an impact on operations.  *Id.*  Mastromano did not recall any differences between the list Jacobi submitted and the list that was approved by Central Office.  Ex. 5, 111:3-10.

Ultimately Jacobi created a list of H+H employees whose positions were no longer deemed critical to Jacobi's operations.  In the end, Jacobi eliminated 26 positions as part of the June MEII with varying titles in varying departments.  *See* Ex. 13.   Of the 26  positions selected, 13 were held by employees who identify as White.  *Id.*   10 identify as Black, 1 identifies as Asian, and 2 identify as Hispanic.  *Id.*  24 employees whose positions were selected were over the age of 40.  *Id.*  Individuals whose had fall back Group 12 titles were offered to move to those titles.  *See, e.g.*, Ex. 7, 106:10-16; *see also* Ex. 9.  Employees whose positions were eliminated could also be hired by H+H into other open positions.   Indeed, 6 of the

individuals selected as part of either the February or June 2017 MEII either continued to work for Jacobi in a Group 11 title, or were hired into Group 11 positions.  *See* Ex. 9.  An additional employee was hired by another H+H acute care facility as an Assistant Director of Nursing.  *Id*.

**F.      At Least 3 Putative Class Members Have Released the Claims**

At least three putative class members have since signed agreements with H+H that released all claims against H+H and the City, including the claims asserted in this action. *See* Releases, (hereafter, "Ex. 14").  The releases in each agreement specifically release all claims under the ADEA, Title VII, SHRL and CHRL.  *Id*.

**G.      Richardson & Birdsong's Claims**

Plaintiffs have put forth Hebert Richardson and Annette Birdsong as the proposed class representatives.  Richardson was born in 1956, self-identifies as Black, and began working for H+H at Jacobi and North Central Bronx ("NCB") in June 2002 when he was over 40 years old. Richardson Dep. (hereafter, "Ex. 15") 11:14-21, 22:10-24, 23:-5-16.  In 2011, he became an Associate Director of Support Services for NCB and Jacobi.  *Id.* 23:2-5.  In 2013, he transitioned to just Jacobi.  *Id*. 27:1-4.  In 2017, no one else at Jacobi held his same title.  *Id*. 46:12-14.

In February 2017, at the age of 61, H+H eliminated Richardson's position as part of the February 2017 MEII.  Ex. 15, 46:9-23.  He claims that in 2016 H+H hired a Hispanic woman, who was over the age of 50, who had the title of Associate Executive Director ("AED"). *Id*. 51:10-53:7.  The AED's employment was not terminated as part of either the February or June MEII.  *Id*.  According to Richardson, after his termination, the AED, staff that reported to him, and even the Operating Room manager each took over some of his responsibilities, and thus expanded the AED's layers of control.  *Id*. 68:12-69:25.  Richardson claims that after his termination, a Hispanic woman who held the title of Assistant Manager of Support Services, a lower title than plaintiff, also took over *some* of his job responsibilities.  *Id*. 48:1-50:11.

Richardson has no knowledge as to if his position at H+H was reposted. *Id*. 64:16-18. Richardson has admitted that he has no personal knowledge as to why H+H undertook the MEIIs or how H+H undertook the MEII. *Id*. 42:6-18, 45:25-46:8. Richardson's department reported to Mastromano. *See* Jacobi Tables of Organization (hereafter, "Ex. 16") at D_006431.

Birdsong was born in 1957 and self-identifies as Black. Birdsong Dep. (hereafter, "Ex. 17") 12:20-25. H+H hired Birdsong as an Executive Secretary in January 2009 when she was fifty-two years old. *Id*. 34:7-15. In 2016, she moved to the Patient Relations Department. *Id*. 44:3-46:14. She was the only Executive Secretary in Patient Relations. *Id*. 50:4-13. In 2017, Birdsong's position was eliminated as part of the June 2017 MEII. Birdsong testified that she understood that the reason H+H undertook the MEII was because of redundancy. *Id*. 51:19-53:5. Birdsong does not know who selected her position for inclusion in the June MEII, but she believed HR was involved in the decision. *Id*. 54:2-56:3. Birdsong testified that she was not alleging that anyone else was hired to do her job after she resigned. *Id*. 60:13-18. She later conceded that the job postings for Executive Secretary she had seen were not in the Patient Relations Department. *Id*. 92:18-93:3. Patient Relations was overseen by Donna Geiss, who reported directly to Mastromano. *See* Ex. 16 at D_006430.

## ARGUMENT

## I.     ADEA CLAIM NOT SUBJECT TO CLASS CERTIFICATION

Plaintiffs attempt to certify a class on their ADEA claims should be denied as "[r]emedies under the ADEA are limited to the procedures set out in the Fair Labor Standards Act." *See, e.g.*, *Osborne v. United Tech. Corp.*, 1977 U.S. Dist. LEXIS 17087 (D. Conn. Mar. 3, 1977) (striking class action allegations in ADEA case); *see also* 29 U.S.C. § 626(b). "There can be no doubt that the express language of § 7(b) of the ADEA selects the class action mechanism defined in § 16(b) of the FLSA, not that set forth in Rule 23. This has been the conclusion of

every circuit court that has faced the question of whether the ADEA incorporates the FLSA class action procedure." *Lusardi v. Xerox Corp.*, 99 F.R.D. 89, 92 (D.N.J. 1983) (citing *EEOC v. Gilbarco, Inc.*, 615 F.2d 985 (4th Cir. 1980); *Bean v. Crocker National Bank*, 600 F.2d 754 (9th Cir. 1979); *LaChapelle v. Owens-Illinois, Inc.*, 513 F.2d 286 (5th Cir. 1975)); *see also* 29 U.S.C. § 216.  Accordingly, to the extent plaintiffs are seeking to certify a Rule 23 class pursuant to the ADEA, plaintiffs' motion should be denied.

## II.     PLAINTIFFS FAIL TO SATISFY RULE 23(A).

"Rule 23 does not set forth a mere pleading standard" but instead demands a "rigorous analysis" that may "entail some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011).  With the demanding standard in mind, plaintiffs do not come close to establishing "that the prerequisites of Rule 23(a) [and (b)] have been satisfied." *Id*. at 351 (quoting *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 161 (1982)).  As set forth below, after extensive discovery it is plain that class certification should be denied.

### A.     Plaintiffs Are Unable to Establish Commonality Under Rule 23(a)(2)

Plaintiff are unable to establish commonality under Rule 23(a)(2).  Rule 23(a)(2) requires plaintiff to establish "there are questions of law or fact common to the class."  But merely "[r]eciting these questions is not sufficient to obtain class certification." *Dukes*, 564 U.S. at 349.  Plaintiffs must provide a "common contention" to establish "the capacity of a class wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id*. at 350 (emphasis in original)(internal quotation omitted).  In other words, plaintiffs must provide "some glue holding the alleged *reasons* for all those decisions together." *Id*. at 352 (emphasis in original).

As an initial matter, plaintiffs' class definition appears to include former Jacobi employees with either age or race discrimination claims.  It is plainly inappropriate for a class to include individuals with age and race discrimination claims in one class.  Discrimination on the basis of race is not indicative of discrimination on the basis of age, and vice versa.  No matter, for the reasons set forth below, plaintiffs fall well short of providing this "glue."

### (a) Disparate Impact

Plaintiffs seek to certify a call that is asserting disparate impact discrimination claims pursuant to the ADEA, Title VII, SHRL and CHRL.[4]  *See* Pltf. Mem. at 11.  Courts look to the substantive law governing a case to assess commonality.  *See Kassman v. KPMG LLP*, 416 F. Supp. 3d 252, 274 (S.D.N.Y. Nov. 30, 2018).

### (i)  No Neutral Policy

Plaintiffs have failed to identify a specific facially neutral policy.  The essence of any disparate impact claim under the ADEA, Title VII, SHRL and CHRL, is that a facially neutral selection method disproportionally harms a protected class.  *See Smith v. City of Jackson*, 544 U.S. 288, 241 (2005); *Attard v. City of N.Y.*, 451 F. App'x 21, 24 (2d Cir. 2011); *Teasdale v. N.Y.C. Fire Dep't*, 574 F. App'x 50, 52 (2d Cir. 2014).   The Supreme Court has explained that it "is not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact." *Smith*, 544 U.S. at 241.  "Rather, the employee is 'responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities.'"  *Id.* (citation omitted).  "[I]n the absence of a 'specific employment practice' pertinent across a putative class, merely pointing to 'an overall

---

[4] It appears from the face plaintiff's memo of law that they are not attempting to certify a class on the basis of their § 1983 claim.  To the extent that plaintiffs are, they cannot assert a disparate impact § 1983 claim, as such a claim requires proof of intentional discrimination.  *See Reynolds v. Barrett,* 685 F.3d 193, 201 (2d Cir. 2012).

[class]-based disparity does not suffice." *Richardson v. City of New York*, 17 Civ. 9447 (JPO), 2021 U.S. Dist. LEXIS 90822, *23 (S.D.N.Y. May 12, 2021) (quoting *Dukes*, 564 U.S. at 357). Entirely absent from plaintiffs' motion or the FAC is a description of the *specific* policy that allegedly caused a statistical disparity. Instead, plaintiffs point to the nebulous "2017 MEII." *See* Pltf. Mem. at 9-12. The "2017 MEII" does not satisfy plaintiffs' burden.

First, there was no such "2017 MEII." Rather, H+H had a February MEII and a June MEII. The two cannot be combined. As set forth at length above, the decision to implement each MEII were made by different individuals at H+H Central, were implemented by differing individuals at Jacobi, who each only selected positions that reported to them, and had different sets of guidance. H+H Central provided Jacobi with a target number of FTEs for the June MEII, but not the February MEII. Likewise, for the June MEII, H+H had developed a standardized table of organization that Jacobi was to use as a guide to select positions, but the table had not yet been developed for the February MEII. Similarly, Jacobi's leadership did not consult with one another about positions that did not report to them. For instance, Pinnacchio selected nursing management positions, while Sampson selected HR positions and Mastromano selected operations positions. Further, Sampson was not involved at all in selecting positions for the February 2017 MEII. And, significantly, each of Jacobi's leadership approached the February and June MEII differently. Pinnacchio focused on Directors in February, but did not consider Directors at all in the June MEII. Pinnacchio also consulted with her Directors for the June MEII. Mastromano, however, did not consult with his Directors. Indeed, plaintiffs have not shown that H+H constrained Jacobi's leadership in any way from selecting the positions that they thought should be eliminated. *Rirchardson*, 2021 U.S. Dist. LEXIS 90822 at *26 (denying class certification where there was no restraint on FDNY supervisors' authority to select

candidates for promotion or raise.).  Accordingly, "[p]laintiffs have not shown that all of their proposed class members would have been subjected to the same mode of discrimination." *Richardson*, 2021 U.S. Dist. LEXIS 90822 at *24.

Second, even if the Court were to find that there was one singular "2017 MEII," and there was not, such is the sort of "generalized policy" the Supreme Court has held is not sufficient for a disparate impact claim.  *See Smith*, 544 U.S. at 241.  The allegations in this case are akin to the numerous courts that have held that "plaintiffs terminated in a layoff cannot 'point to the layoff itself as the practice that disparately impacted older workers.'"  *See Gilbreath v. Brookshire Grocery Co.*, 400 F. Supp. 3d 580, 590 (E.D. Tx. Aug. 21, 2019) (citation omitted and relying on a litany of cases throughout the country).  *Gilbreath* is similar to this case.  There, the defendant had hired a consulting firm to help to help streamline operations and to find ways to be more efficient.  *Id*. at 584.  The consulting firm recommended they eliminate unnecessary positions.  *Id*.  The head of each department was then tasked to "find[] 'the savings or decid[e] what's best for the business."  *Id*. In granting summary judgment on the disparate impact claim, the court held that the defendant's "alleged cost-cutting policy underling the RIF is not the kind of test, requirement, or practice that could give rise to a disparate impact claim."  *Id*.at 591. Here, too, plaintiffs have not pointed to a *specific* employment practice.

Finally, to the extent that plaintiffs complain about criteria that they believe Jacobi should have used, but did not, in selecting positions for elimination, that would also not be the basis for class certification.  *See* Pltf. Mem. at 5.  Courts have found similar claims to be unactionable.  *See Fitzpatrick v. N.Y. Cornell Hosp.*, 00 Civ. 8594 (LAP), 2002 U.S. Dist. LEXIS 25166, at *17-18 (S.D.N.Y. Dec. 13, 2002) ("a difference of opinion as to the means and policies the Hospital employs when determining who will be laid off and the qualifications of those it

will employ or reemploy" are "business decisions which" the Court is "instructed not to second-guess."). Further, such claims are akin to a claim that H+H permitted Jacobi's leadership to have too much discretion in picking positions to be eliminated. "But too much discretion, as *Dukes* explains, is 'the opposite of a uniform employment practice that would provide the commonality needed for a class action.'" *Richardson*, 2021 U.S. Dist. 908222 at *29 (quoting *Dukes*, 564 U.S. at 355).

### (ii)     Dr. Thompson's Analysis Has No Probative Value

Plaintiffs have also failed to satisfy their burden to show that the "2017 MEII" had "a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices.'" *Teasdale v. N.Y.C. Fire Dep't*, 574 F. App'x 50, 52 (2d Cir. 2014). Statistical evidence alone can suffice in a disparate impact case *only* if it is of the kind or degree sufficient to correlate to a specific employment practice with the complained-of adverse effect. *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 991 (1988). Thus "[i]ncomplete or inapplicable analysis, simplistic percentage comparisons, and small sample sizes produce statistical analysis with little probative value." *New York City Transit Auth. v. Beazer*, 440 U.S. 568, 582-87 (1979). As set forth below, Dr. Thompson's statistical analysis offers no causal link between any alleged "disparity" and the "policies and practices".

Significantly, the report relied on by plaintiffs is based on flawed data and, thus, no conclusions can be drawn from it. Plaintiffs rely solely on the original expert report of Dr. Shane Thompson, *see* Pltf. Ex. A, to support their claim that there is statistically significant evidence that age was a factor and that it was "unlikely that race was not a factor." *See* Pl. Mem. at 10. But, the data set used in Dr. Thompson's report relies on double counting most employees in the data. *See* Dr. Erath Expert Report, (hereafter, "Ex. 18") at 2. Further, Dr. Thompson included 143 Group 12 employees in his data. As set forth above, positions held by Group 12

employees were not considered in either the February or June MEII.  Mastromano never testified that Group 11 and Group 12 Coordinating Managers are the same.  Group 11 Coordinating Managers provide oversight to clerical staff, while Group 12 Coordinating Managers are involved in direct patient care, like a physician assistant, and also provide oversight to others engaged in clinical care.  Ex. 5, 123:18-124:17.  Further, Group 12 employees are not able to issue discipline.  Ex. 5, 125:8-12.  And, significantly, only one position selected for elimination at Jacobi in either February or June 2017 was a Group 11 Coordinating Manager position.  Exs. 8 & 13.  Indeed, after defendants' expert, Dr. Christopher Erath, pointed out the issues with the data set, Dr. Thompson submitted a supplemental report, admitting that he had double counted and abandoning inclusion of Group 12 employees.  *See* Dr. Thompson Sup. Rpt. (hereafter, "Ex. 19") at ¶ 5; *see* Thompson Dep. (hereafter, "Ex. 20") 67:18-22.  Curiously, plaintiffs neither submitted this supplemental report to the Court nor disclosed that the original report relied on a flawed data sat.

Dr. Thompson's analysis also assumes, without reliance on any documentation or testimony, that the February and June MEII were the same.  Indeed, he admitted it could be that his conclusions on statistical significance were influenced by one of the MEII, but not the other.  Ex. 20, 103:7-105:23.  Accordingly, his analysis is not indicative that either MEII had had a disparate impact on workers older than 40 or who were not white.

Even assuming it was appropriate to combine the February and June MEII, Dr. Thompson's did not otherwise correctly analyze the proper populations of positions that were under consideration for inclusion in the MEII, and therefore his analysis is irrelevant.  "The corresponding population in a reduction-in-force situation consists of workers subject to termination."  *See Smith v. Xerox Corp.*, 196 F.3d 358, 368 (2d Cir. 1999).  Here, Dr. Thompson

still did not include the appropriate pool of employees for consideration.  For instance, he did not include any Group 11 employees hired between the February 2017 and June 2017 MEII, unless their position was selected for elimination in June 2017.  Ex. 20, 84:8-87:3.  Thompson also eliminated anyone whose position changed between the February and June 2017 MEII, if he could not tell that they still worked at Jacobi.  Ex. 20, 87:4-19.  Further, if someone worked at Jacobi prior to the February MEII, but then left Jacobi on their own accord, he also did not include them in his analysis even though, as he admitted, they could have been selected in the February MEII.  Ex. 20, 106:2-11.  The analysis also does not reflect the actual selection process undertaken by Jacobi leadership.  For instance, Pennacchio focused on Directors in the February 2017 MEII.  Thus, managerial positions other than Directors who reported to Pennacchio were not considered for the February MEII.  And, significantly, Group 11 employees whose roles had a direct impact on patient care could not be considered at all.  This error is highlighted by Dr. Thompson's inclusion of the Director of Nursing, a role that plainly has a direct impact on patient care, in his analysis.  *See* Ex. 19, Fig. 1-3.

Finally, even assuming that Dr. Thompson's inflated data set and assumptions were correct and appropriate, and they were not, his conclusions do not support plaintiffs' allegations in the FAC that the "2017 MEII" had a disparate impact on either (a) the selection of non-white individuals or (b) individuals 40 and over.  Indeed, Dr. Thompson did not analyze whether there was a statistical significance in the selection of Group 11 positions held by white versus non-white employees.  Ex. 20, 108:8-17. As to the selection of employees over 40 versus under 40, Dr. Thompson found this statistically significant at the "10% level," but the generally accepted level of statistical significance is at the 5% level, which Dr. Thompson even acknowledged in his original report.  *See* Pl. Ex. A, n. 2; Ex. 20, 109:4-110:19; *see also Smith v.*

*Xerox Corp.*, 196 F.3d 358, (2d Cir. 1999) (holding that "Courts generally consider" the 5% probability level, or about two standard deviations, "sufficient to warrant an inference of discrimination.").

### (b) Disparate Treatment

Although plaintiffs' FAC asserts disparate treatment claims pursuant to a pattern or practice theory pursuant to the ADEA, Title VII, SHRL CHRL, and §1983, plaintiffs do not appear to be seeking certification on the §1983 claim. *See* Pltf. Mem. at 11. Even if they are, certification should be denied on plaintiffs' §1983 claim for the same reason as Title VII.

There is a "wide gap" between an individual's intentional discrimination claim and "the existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim and the class claim will share common question of law or fact . . . ." *Dukes*, 564 U.S. 352-53 (citation omitted). Bridging that gap under Rule 23(a)(2) requires "'[s]ignificant proof that an employer operated under a *general policy of discrimination*'" that "'manifested itself in . . . [the employment practice] in the same general fashion . . . .'" *Id.* at 353 (emphasis added). Plaintiffs must prove that bias "was directed at a class of victims." *US v. City of N.Y.*, 717 F.3d 72, 83 (2d Cir. 2013). There is no such "significant proof" here.

The statistical analysis put forth by plaintiffs does not support their pattern and practice claim. "Statistics alone may be sufficient to establish a pattern or practice of discrimination, though the statistics must not only be statistically significant in the mathematical sense. They must also be of a level that makes other plausible non-discriminatory explanations very unlikely.'" *Richardson*, 2021 U.S. Dist. LEXIS 90822 at *31 (internal citations and quotations omitted). It is not, however, satisfied by "an equivocal statistical analysis or an analysis that obfuscates the principal explanatory variable to create the appearance of difference.'" *Id.* at *32 (quotation and citation omitted).

Dr. Thompson's analysis again fails as, in addition to the issues set forth above with his analysis, he also did not consider several non-discriminatory variables. For instance, he did not consider job duties, titles or departments into account, or whether the position had a direct impact on patient care. Dr. Thompson did not perform any sort of analysis of whether there was a statistical significance within each title based on age, or race, or the department the title was in. *See* Ex. 20, 101:16-102:4. There is no indication if the age or race imbalance in one MEII, or even a handful, of titles was causing his conclusion. Further, even if he had, Dr. Thompson testified he would not have been able to draw any conclusions from that data. Ex. 20, 90:17-93:11. But, that is not true. For example, had Dr. Thompson looked at the SADs he could plainly see that all but one SAD position selected for elimination was held by a White former employee, and that there was little correlation between age and reduction status. *See* Ex. 18 at 5. Thus, Dr. Thompson's report fails to support a finding of commonality. *See Sheehan v. Purolator, Inc.*, 839 F.2d 99, 103 (2d Cir. 1988) (affirming denial of class certification where statistics "did not take into account various relevant non-discriminatory factors"); *Fuller v. Instinet, Inc.*, 120 Fed. Appx. 845, 846 (2d Cir. 2004 ) (affirming denial of certification where plaintiff "fail[ed] to include any relevant non-discriminatory factors in her statistical study"); *Ross v. Nikko Sec. Co. Int'l, Inc.*, 133 F.R.D. 96, 97 (S.D.N.Y. 1990) (same).

### (i) Anecdotal Evidence

Without any statistical evidence, plaintiffs have only their scant anecdotal evidence left to support a finding that a common discriminatory mode of existed in the February and June MEII. In pattern or practice cases, anecdotal evidence serves to "bring the cold numbers convincingly to life." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339 (1977). Despite the extensive number of depositions taken and discovery produced in this case, Plaintiffs rely exclusively on speculative declarations from putative class members for anecdotal

evidence.  *Richardson*, 2021 U.S. Dist. LEXIS 90822 at * 39-40 ("[T]he anecdotal evidence Plaintiffs offer is generally thin or purely speculative with respect to whether race [or age] animated a challenged employment decision.").   These class members speculate, without any evidence, as to the motivations of H+H in selecting their positions for reduction,[5] that H+H has now filled their position, and as to the functions and responsibilities of anyone who has been hired into a Group 11 title. Plaintiffs cite to no evidence that the individuals who selected positions for elimination at Jacobi, who were, themselves over 40, had a practice of discriminating against individuals over 40 and individuals who were not white. The composition of this group also belies any evidence of discriminatory intent.  It includes individuals who were not yet 40 at the time that their position was eliminated as well as White individuals.  Plaintiffs have failed to show that Jacobi leadership engaged in systematic racism and age discrimination in selecting positions for inclusion in the MEII.

### (c) Breach of Contract

Plaintiffs' FAC contains a breach of contract claim for breaching unidentified "pre-termination procedures."   *See* FAC ¶¶ 103-08. Other than referencing it in their introduction, plaintiffs do not mention this claim anywhere else in their motion for class certification.  *See* Pltf. Mem.  Accordingly, defendants presume that plaintiffs are not seeking certification on this claim.  No matter, no class can be certified as defendants were not party to any contract with the plaintiffs and plaintiffs have not identified any.  Under New York law, there is generally no contractual liability in an at-will employment relationship.  *See Hargett v. Metro. Tr. Auth.*, 552 F. Supp. 2d 393, 402 (S.D.N.Y. 2008), *aff'd on other rounds*, 381 F. App'x 12 (2d Cir. 2010).  In response to interrogatories, plaintiffs identified Operating Procedure 20-39

---

[5] The workforce demographics at Jacobi remained virtually unchanged after the both the February and June MEII.  *See* H+H Position Statement (hereafter, "Ex. 23") at D_002571-72.

as the unidentified procedure, *see* Ex. 21, Resp. No. 23, *see also* Pltf. Ex. FF.  Even assuming

that an operating procedure could form the basis for a contract claim, and it cannot, as plaintiffs

acknowledge, that operating procedure was rescinded prior to the MEII.  *See* Pltf. Mem. at 6,

Pltf. Ex. EE.  Accordingly, class certification should also be denied on plaintiffs' contract claim.

**B.      Plaintiffs Are Unable to Establish Numerosity**

Plaintiffs are also unable to meet the numerosity requirement.   Rule 23(a)(1)

requires that the "proposed class is so numerous that joinder of each member is impracticable."

*See Ansari v. New York Univ.*, 179 F.R.D. 112, 114 (S.D.N.Y. 1998).   "Generally speaking,

courts will find that the 'numerosity' requirement has been satisfied when the class comprises 40

or more members and will find that it has not been satisfied when the class comprises 21 or

fewer." *Id*.  Where a proposed class is between 21 and 40 class members, courts must consider

other factors including judicial economy, geographic dispersion of members, financial resources

of those members, ability of the members to file individual suits, and requests for prospective

relief that may have an effect on future class members.  *Id*.

The class that plaintiffs seek to certify, of people "40 years old or older and/or

non-white" whose "employment at Jacobi Medical Center was terminated in 2017 as part of" the

February and June MEII is not 45 people as plaintiffs claim.  *See* Pltf. Mem. at 8-9.  Of the 19

individuals whose positions were selected for elimination as part of the February MEII, only 14

were terminated.  Three employees reverted to their underlying Group 12 position and continued

to work for H+H.  *See* Ex. 9.  Another two signed agreements with H+H that permitted them to

remain employed by H+H longer, before they retired.  *See* Ex. 14.  Of the 26 individuals whose

positions were selected for elimination as part of the June MEII, only 24 had their employment

terminated.  One signed a release that permitted him to remain employed longer and retire, and

another reverted to her underlying Group 12 position.  Exs. 9 & 14.  Further, one of the

individuals whose position was selected as part of the June MEII is both White and under the age of 40. *See* Ex. 13. Accordingly, only 38 individuals over the age of 40 and/or who were not white had their employment terminated as a result of either the February or June MEII. Further, as set forth above, it is inappropriate to combine the two MEII and to combine claims of race and age discrimination. Only 25 current or former employees whose positions were selected in either MEII are not white: 12 employees in the February MEII and 13 in the June MEII.

To the extent that any of the numbers fall within the "gray area between 21 and 40," the factors weight against finding numerosity. There is no evidence that permitting the suit to go forward will avoid multiplicity of redundant lawsuits. In the years since plaintiffs filed this lawsuit, no other former Jacobi employees have filed suit about the MEII. The class is not geographically dispersed. Class members are all former managerial staff and there is no evidence that the prospective class members lack the financial resource, nor is this the situation where the proposed class members are unsophisticated. To the opposite, plaintiffs' counsel already represent 8 other Jacobi employees. Finally, plaintiffs are not seeking prospective relief of the sort that would impact other class members. Accordingly, joinder is not impracticable. *See Ansari*, 179 F.R.D. at 115-16.

## C.    Plaintiffs are Unable to Establish Typicality

Plaintiffs also do not satisfy the typicality or adequacy requirements of Rule 23(a). Rule 23(a) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class," meaning that "each class member's claims arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability. *Elisa W. v. City of N.Y.,* No. 15-CV-5273 (KMW), 2021 U.S. Dist. LEXIS 167910, at *35 (S.D.N.Y. Sep. 3, 2021). Richardson and Birdsong's most fundamental shortcoming is that they do "not have claims that would have been typical of the *entire class*."

*Cooper v. Southern Co.*, 390 F.3d 695, 715 (11th Cir. 2004) (emphasis in original).  Richardson and Birdsong hold only two of the numerous titles that were eligible for consideration for the MEII, they were both hired when they were over 40, and they both worked in departments that ultimately reported to only one of the Jacobi leadership responsible for selecting positions, Mastromano.  Accordingly, their claims cannot be said to be typical of the entire class.

## III.      PLAINTIFFS FAIL TO SATISFY RULE 23(B)(3).

Plaintiffs cannot satisfy the requirements of Rule 23(B)(3).  Plaintiffs assert, in conclusory fashion, that they have satisfied the predominance and superiority requirements of Rule 23(b)(3).  Pltf. Mem. pp. 17-19.  But, the predominance inquiry is "far more demanding" than the commonality inquiry, and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Prods. v. Windsor*, 521 U.S. 591, 623-24 (1997).  Indeed, any common issues must be "more substantial than the issues subject only to individualized proof."  *Glatt v. Fox Searchlight Pictures, inc.*, 811 F.3d 528, 538 (2d Cir. 2015).  The class that plaintiffs have lumped together is anything but "cohesive".

Here, even if plaintiffs establish a *prima facie* case of discrimination, defendants are still afforded "a broad opportunity to present in rebuttal *any relevant evidence* that shows that it lacked such an intent. *City of New York*, 717 F.3d at 87 (emphasis added).  The litany of individualized issues as to why each position was selected for inclusion in either the MEII, are issues unique to each class member.  Further, the decisions as to which positions to eliminate were made by different individuals, and that will also need to be analyzed separately.  These thorny individualized questions, which are unavoidable as a result of plaintiffs' class, will subsume any common questions at trial.  Rule 23(b)(3) certification is not warranted in these circumstances. *See Moore v. Publicis Grp. SA.,* 11 Civ. 11279, 2014 U.S. Dist. LEXIS 185384, at *26-27 (S.D.N.Y. May 15, 2014) (no predominance because a single trial "would require

individualized inquiries into the actions of each managerial employee who influenced a member's pay"); *Oakley v. Verizon Communs., Inc*, 09 Civ. 9175 (CM), 2012 U.S. Dist. LEXIS 12975 at *43-45 (S.D.N.Y. Feb. 1, 2012) (no predominance because "individual questions of causation in each case are extensive"). Further, individual trials are also unavoidable as to damages because plaintiffs have no way of providing damages on a class-wide basis. *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013) (holding that "class action was improperly certified under Rule 23(b)(3)" because "Questions of individual damage calculations will inevitably overwhelm questions common to the class."). Individual questions, therefore, will predominate over any common questions.

Plaintiffs also fail to establish that a class action is superior to individual actions. First, "[i]f there are a great number of issues other than damage that must be resolved separately for each class member, or there is a need for a significant number of separate trials, the class action is unmanageable." 5 Moore's Federal Practice § 23.46(1). Here, the Court will need to make individualized determinations as to (1) whether the decision to select each plaintiff's position was tainted with bias; (2) whether legitimate nondiscriminatory business reasons justified the employment decision; and (3) the amount of damages an individual suffered.

In addition, Rule 23(b)(3) was intended to vindicate the rights of groups "who individually would be without effective strength to bring their opponents into court at all." *Amchem*, 521 U.S. at 617 (internal quotation omitted). Unlike other class actions, plaintiffs can hardly maintain that they would be unable to redress their claims on an individual basis. 8 of the purported class members are already represented by counsel in this case, and they can follow suit by filing their own lawsuit. Accordingly, plaintiffs have not met the burdens of Rule 23(B)(3) and certification should be denied.

## <u>CONCLUSION</u>

For the foregoing reasons, defendants respectfully request that the Court deny plaintiffs' motion in its entirety, and grant defendants' costs and disbursements, together with such further other and further relief as the Court deems just and proper.

Dated:      New York, New York
            March 17, 2022

HON. SYLVIA O. HINDS-RADIX
Corporation Counsel of the
  City of New York
Attorney for Defendants
100 Church Street, 2nd Floor
New York, New York 10007
(212) 356-1104
abalog@law.nyc.gov

By:     /s  Aliza J. Balog
        Aliza J. Balog
        Assistant Corporation Counsel