19-CV-03786

UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK

CLARENCE BOWEN-ALLEN, ET. AL.

Plaintiffs,

-against-

THE CITY OF NEW YORK, and NEW YORK CITY HEALTH AND HOSPITALS CORPORATION,

Defendants.

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR CROSS-MOTIONS FOR SUMMARY JUDGMENT AND TO STRIKE THE EXPERT TESTIMONY OF DR. SHANE THOMPSON, AND IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT AND TO STRIKE TESTIMONY OF DR. CHRISTOPHER ERATH**

*HON. SYLVIA O. HINDS-RADIX*
*Corporation Counsel of the City of New York*
*Attorney for Defendants*
*100 Church Street, rm 2-316*
*New York, N.Y.  10007*

*Of Counsel:  Elisheva L. Rosen*
*Tel:  (212) 356-3522*
*Matter #: 2019-026404*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................- 1 -

STATEMENT OF FACTS ...................................................................................- 2 -

ARGUMENT.......................................................................................................- 6 -

POINT I..............................................................................................................- 6 -

DEFENDANT CITY SHOULD BE DISMISSED BECAUSE IT IS NOT A JOINT
EMPLOYER WITH DEFENDANT H+H................................................................- 6 -

POINT II.............................................................................................................- 7 -

PLAINTIFFS' TITLE VII AND/OR ADEA CLAIMS ARE PARTIALLY BARRED BY
FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES AND/OR TIME-
BARRED……………………………………………………………………    - 7 -

POINT III............................................................................................................- 9 -

PLAINTIFFS' BREACH OF CONTRACT CLAIM SHOULD BE DISMISSED...........- 9 -

POINT IV............................................................................................................- 11 -

PLAINTIFFS' DISPARATE IMPACT CLAIMS SHOULD BE DISMISSED ..............- 11 -

    A.    Disparate Impact Standard.................................................................- 11 -

    B.    Application - No Neutral Employment Policy....................................- 13 -

    C.    Application - No Statistical Disparity or Causal Connection .............- 17 -

    D.    Application - Legitimate Business Reason .........................................- 19 -

    E.    Application - No Comparators ...........................................................- 22 -

POINT V.............................................................................................................- 23 -

PLAINTIFFS' INTENTIONAL DISCRIMINATION CLAIMS SHOULD BE DISMISSED
..........................................................................................................................- 23 -

    A.    Standard of Review...........................................................................- 23 -

    B.    Plaintiffs Fail to Establish a *Prima Facie* Case of Disparate Treatment Based on
Age………......................................................................................................- 27 -

    C.    Plaintiffs Fail to Establish a *Prima Facie* Case of Disparate Treatment Based on
Race………....................................................................................................- 29 -

    D.    Plaintiffs Fail to Allege a Pattern or Practice Claim ..........................- 31 -

    E.    Defendants Had Legitimate Reasons for the Actions of Which Plaintiffs Complain
and Plaintiffs Cannot Establish Pretext.......................................................- 31 -

    F.    Plaintiffs CHRL Discrimination Claims Fail....................................- 34 -

POINT VI............................................................................................................- 34 -

PLAINTIFFS' SECTION 1981 AND 1983 CLAIMS FAIL AS A MATTER OF LAW- 34 -

    A.    No Private Right of Action under Section 1981 ................................- 34 -

    B.      Plaintiff fails to Establish Monell Liability as Against the City of New York or H+H………...................................................................................................... - 35 -

    C.      No Evidence of Discriminatory Intent................................................. - 36 -

POINT VII ...................................................................................................................... - 37 -

    THE COURT SHOULD EXCLUDE THE REPORTS AND TESTIMONY OF PLAINTIFFS' EXPERT, DR. THOMPSON ................................................... - 37 -

    A.      Standard for Admissibility of Expert Evidence................................. - 37 -

    B.      Dr. Thompson's Reports and Testimony Should be Excluded in their Entirety - 38 -

POINT VIII...................................................................................................................... - 46 -

    THE REPORT AND TESTIMONY OF DEFENDANTS' EXPERT, DR. ERATH, SHOULD NOT BE EXCLUDED ................................................................... - 46 -

CONCLUSION................................................................................................................. - 51 -

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Adams-Flores v. City of N.Y.,
    2020 U.S. Dist. LEXIS 37411 (S.D.N.Y. 2020) (J. Furman) ....................................6

Amorgianos v. Amtrak,
    303 F.3d 256 (2d Cir. 2002)..................................................................*passim*

AmTrust N. Am., Inc v KF&B, Inc.,
    2020 U.S. Dist. LEXIS 170464 (S.D.N.Y. 2020).......................................39, 40, 46

Arciuolo v. Tomtec Inc.,
    2015 U.S. Dist. LEXIS 143862 (D. Conn. 2015) ...................................................16

Arista Records LLC v. Usenet.com, Inc.,
    608 F. Supp. 2d 409 (S.D.N.Y. 2009)..................................................................44

Attard v. City of N.Y.,
    451 F. App'x 21 (2d Cir. 2011) ...........................................................................12

Baron v. Port Auth. of New York and New Jersey,
    271 F.3d 81 (2d Cir. 2001).................................................................................9

Bickerstaff v. Vassar College,
    196 F.3d 435 (2d Cir. 1999), cert. denied, 530 U.S. 1242 (2000) .........................32

Blige v. City Univ. of New York,
    2017 U.S. Dist. LEXIS 8354 (S.D.N.Y. 2017).......................................................25

Brown v. Coach Stores,
    163 F.3d 706 (2d Cir. 1998).........................................................................12, 13

Cameron v. Cmty. Aid for Retarded Child., Inc.,
    335 F.3d 60 (2d Cir. 2003).......................................................................28, 29, 31

Carter v. New Venture Gear, Inc.,
    310 Fed. Appx. 454 (2d Cir. 2009)......................................................................8, 9

Cerni v J.P. Morgan Sec. LLC,
    208 F. Supp. 3d 533 (S.D.N.Y. 2016)..............................................................16, 22

Crowley v. Billboard Mag.,
    576 F. Supp. 3d 132 (S.D.N.Y. 2021)..................................................................29

D'Amico v. City of New York,
    132 F.3d 145 (2d Cir. 1998)...................................................................34

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
    509 U.S. 579 (1993)..............................................................37, 44, 48

De Petris v. Union Settlement Assoc.,
    86 N.Y.2d 406 (1995)............................................................................10

De'Bey v City of N.Y.,
    2021 U.S. Dist. LEXIS 207665 (S.D.N.Y. 2021)...................................6

Delaney v. Bank of Am. Corp.,
    766 F.3d 163 (2d Cir. 2014)..................................................................26

Dister v. Cont'l Group, Inc.,
    859 F.2d 1108 (2d Cir. 1988)................................................................32

Drayton v. City of N.Y.,
    2023 U.S. Dist. LEXIS 85769 (S.D.N.Y. 2023)...................................48

Duplan v. City of New York,
    888 F.3d 612 (2d Cir. 2018)..................................................................34

Fisher v. Vassar Coll.,
    114 F.3d 1332 (2d Cir. 1997), cert. denied, 522 U.S. 1075 (1998).......32

Gibbs v. Metro. Transp. Auth.,
    2014 U.S. Dist. LEXIS 159093 (E.D.N.Y. 2014).................................35

Gilbreath v. Brookshire Grocery Co.,
    400 F. Supp. 3d 580 (E.D. Tx. 2019)...............................................16, 17

Gomez v. N.Y.C. Police Dep't,
    191 F. Supp. 3d 293 (S.D.N.Y. 2016)..................................................8, 9

Grady v. Affiliated Cent., Inc.,
    130 F.3d 553 (2d Cir. 1997).................................................................28

Graham v. Long Island R.R.,
    230 F.3d 34 (2d Cir. 2000)...................................................................25

Grillo v. N.Y. City Transit Auth.,
    291 F.3d 231 (2d Cir. 2002).................................................................29

Gross v. FBL Fin. Servs.,
    557 U.S. 167 (2009)..............................................................................24

iv

Gulino v. N.Y. State Educ. Dep't,
    460 F.3d 361 (2d Cir. N.Y. 2006)...............................................................12

Hargett v. Metro. Tr. Auth.,
    552 F. Supp. 2d 393 (S.D.N.Y. 2008), aff'd on other grounds, 381 F. App'x
    12 (2d Cir. 2010)...............................................................................9, 10

Harlen Assoc. v. Inc. Vill. of Mineola,
    273 F.3d 494 (2d Cir. 2001)......................................................................25

Hazen Paper Co. v. Biggins,
    507 U.S. 604 (1993)................................................................................16

Hoffman v. Williamsville  Sch. Dist.,
    443 F. App'x 647 (2d Cir. 2011) ...........................................................7, 8, 9

Holowecki v. Fed. Express Corp.,
    440 F.3d 558 (2d Cir. 2005)........................................................................7

Hunt-Watts v. Nassau Health Care Corp.,
    43 F. Supp. 3d 119 (E.D.N.Y. 2014).............................................................36

Jett v. Dallas Indep. Sch. Dist.,
    491 U.S. 701, 109 S. Ct. 2702, 105 L. Ed. 2d 598 (1989) ..................................34

Joffe v. King & Spalding LLP,
    2019 U.S. Dist. LEXIS 163671 (S.D.N.Y. 2019)..............................................48

Johnson v. Holder,
    564 F.3d 95 (2d Cir. 2009).........................................................................15

Juarez v. Northwestern Mut. Life Ins. Co.,
    69 F. Supp. 3d 364 (S.D.N.Y. 2014).............................................................36

Ko v. JP Morgan Chase Bank, N.A.,
    730 Fed. App'x. 62 (2d Cir. 2018)..................................................................7

Littlejohn v City of New York,
    795 F.3d 297 (2d Cir. 2015).......................................................................27

Lively v. WAFRA Inv. Advisory Grp., Inc.,
    6 F.4th 293 (2d Cir. 2021) .........................................................................24

Lobosco v. N.Y. Tel. Co./NYNEX,
    96 N.Y.2d 312 (2001)..............................................................................10

Local 3621, Ems Officers Union v. City of N.Y.,
    2021 U.S. Dist. LEXIS 104810 (S.D.N.Y. 2021)..............................................48

Local 3621 v. City of N.Y.,
  2022 U.S. Dist. LEXIS 212218 (S.D.N.Y. 2022).................................................................48

Luitpold Pharms., Inc. v. ED. Geistlich Sohne A.G. Fur Chemische Industries,
  2015 U.S. Dist. LEXIS 123591 (S.D.N.Y. 2015).............................................................47, 48

Magnani v. N. Shore Cent. Sch. Dist.,
  2019 U.S. Dist. LEXIS 146691 (E.D.N.Y. 2019).................................................................27

Matias v. Montefiore Med. Ctr.,
  2022 U.S. Dist. LEXIS 172848 (S.D.N.Y. 2022).............................................................24, 26

McDonnell Douglas Corp. v. Green,
  411 U.S. 792 (1973).................................................................................................................24

McPherson v. N.Y. City Dep't of Educ.,
  457 F.3d 211 (2d. Cir. 2006)...............................................................................................32, 33

Mejía v. N.Y. City Health & Hosps. Corp.,
  2018 U.S. Dist. LEXIS 119224 (S.D.N.Y. 2018).................................................................35

Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,
  715 F.3d 102 (2d Cir. 2013)...............................................................................................25, 34

Missel v. Cty. of Monroe,
  351 F. App'x 543 (2d Cir. 2009)...........................................................................................35

Monell v. Dep't of Social Services,
  436 U.S. 658 (1978).............................................................................................................35, 36

Naumovski v. Norris,
  934 F. 3d 200 (2d Cir. 2019) ...............................................................................................24

New York City Transit Auth. V. Beazer,
  440 U.S. 568 (1979).............................................................................................................17, 46

Nook v. Long Island R. Co.,
  190 F.Supp.2d 639 (S.D.N.Y. 2002)....................................................................................45

Olutosin v. Gunsett,
  2019 U.S. Dist. LEXIS 189289 (S.D.N.Y. 2019).................................................................47

Ragone v. Atlantic Video,
  595 F.3d 115 (2d Cir. 2010)...................................................................................................7, 8

Reeves v. Sanderson Plumbing Prods.,
  530 U.S. 133 (2000)...............................................................................................................26

Ricci v. DeStefano,
    557 U.S. 557 (2009)............................................................................12

Richardson v. City of New York,
    2021 U.S. Dist. LEXIS 90822 (S.D.N.Y. 2021).................................12

Rinaldi v. Mills,
    2022 U.S. App. LEXIS 33636 (2d Cir. 2022) ...................................34

Ruiz v. County of Rockland,
    609 F.3d 486 (2d Cir. 2010)..............................................................24

Samuel v. Bellevue Hosp. Ctr.,
    366 F. App'x 206 ...............................................................................6

Scott v. Chipotle Mexican Grill, Inc.,
    315 F.R.D. 33 (S.D.N.Y. 2016).............................................38, 47, 48

Scott v. City of N.Y.,
    591 F. Supp. 2d 554 (S.D.N.Y. 2008)...............................48, 49, 50

Sealy v. State Univ. of N.Y.,
    2020 U.S. App LEXIS 34749 (2d Cir. 2020) ....................................34

Serin v. N. Leasing Sys.,
    2010 U.S. Dist. LEXIS 142704 (S.D.N.Y. 2010)................................48

Simpkins v. Bellevue Hosp.,
    832 F. Supp. 69 (S.D.N.Y. 1993)................................................35, 36

Smith v. City of Jackson,
    544 U.S. 228 (2004)....................................................................12, 16

Smith v. City of Jackson,
    544 U.S. 288 (2005)..........................................................................12

Smith v. Xerox Corp.,
    196 F.3d 358 (2d Cir. 1999).........................................18, 19, 42, 45

Sotomayor v. City of New York,
    862 F. Supp. 2d 226 (E.D.N.Y. 2012) ..............................................25

Spires v Metlife Group, Inc.,
    2019 U.S. Dist. LEXIS 160181 (S.D.N.Y. 2019)...............................27

St. Mary's Honor Ctr. v. Hicks,
    509 U.S. 502 (1993)..........................................................................26

Supply & Bldg. Co. v. Estee Lauder Int'l, Inc.,
    2001 U.S. Dist. LEXIS 20737 (S.D.N.Y. 2001)................................................44

Tanvir v. N.Y.C. Health & Hosps. Corp.,
    480 F. App'x 620 (2d Cir. 2012) ........................................................................7

Teasdale v. N.Y.C. Fire Dep't,
    574 F. App'x 50 (2d Cir. 2014) ...............................................................12, 17

Thomas v. Egan,
    1 F. App'x 52 (2d Cir. 2001) .................................................................8, 36

Thomas v. S.E.A.L. Security, Inc.,
    2007 U.S. Dist. LEXIS 63841 (S.D.N.Y. 2007)................................................23

Tooly v. Schwaller,
    919 F.3d 165 (2d Cir. 2019)................................................................21

Tsombanidis v. W. Haven Fire Dep't,
    352 F.3d 565 (2d Cir. 2003)................................................................22

United States v. Barrow,
    400 F.3d 109 (2d Cir. 2005)................................................................47

United States v. Bilzerian,
    926 F.2d 1285 (2d Cir. 1991)................................................................38

United States v. City of New York,
    717 F.3d 72 (2d Cir. 2013)................................................................24

United States v. Duncan,
    42 F.3d 97 (2d Cir. 1994)................................................................38

United States v. Gupta,
    747 F.3d 111 (2d Cir. 2014)................................................................41

United States v. Tenzer,
    213 F.3d 34 (2d Cir. 2000)................................................................15, 31

United States v. Williams,
    506 F.3d 151 (2d Cir. 2007)................................................................37

Valentia Villetti, Faiza Jibril, M.D. v. Guidepoint Glob. LLC,
    2022 U.S. App. LEXIS 18651 (2d Cir. 2022) ................................................29, 31

Varughese v. Mount Sinai Med. Ctr.,
    2015 U.S. Dist. LEXIS 43758 (S.D.N.Y. 2015), aff'd, 693 F. App'x 41 (2d
    Cir. 2017) ................................................................passim

Wade v. New York Tel. Co.,
    500 F. Supp. 1170 (S.D.N.Y. 1980)......................................................................32

Wal-Mart Stores, Inc. v. Dukes,
    564 U.S. 338 (2011)...........................................................................................13

Waters v. Gen. Bd. of Glob. Ministries,
    769 F. Supp. 2d 545 (S.D.N.Y. 2011)................................................................28

Watson v. Fort Worth Bank & Trust,
    487 U.S. 977 (1988).....................................................................................17, 45

Weiner v. McGraw-Hill,
    57 N.Y.2d 458 (1982).......................................................................................9, 10

Weinstock v. Columbia Univ.,
    224 F.3d 33 (2d Cir. 2000)..................................................................................26

Whitting v. Locust Valley Cent. Sch. Dist.,
    2012 U.S. Dist. LEXIS 152233 (E.D.N.Y. 2012).................................................29

Whyte v. Contemporary Guidance Servs., Inc.,
    2004 U.S. Dist. LEXIS 12447 (S.D.N.Y. 2004)...................................................27

Woodard v. N.Y. Health & Hosps. Corp.,
    2010 U.S. Dist. LEXIS 68916 (E.D.N.Y. 2010)....................................................6

**Statutes**

29 U.S.C. § 623(a) ................................................................................................24

29 U.S.C. § 626....................................................................................................7

29 U.S.C. § 631(a) ................................................................................................29

42 U.S.C. § 1981 ("Section 1981")..................................................1, 34, 35, 36, 37

42 U.S.C. § 1983 ("Section 1983")..................................................1, 24, 35, 36, 37

Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq* ("ADEA")...........1, 7, 16, 22, 24

Civil Rights Act of 1964 Title VII, 42 U.S.C. § 2000e *et seq.*("Title VII").......1, 7, 11, 12, 24, 25

N.Y. Civ. Serv. Law § 65(3) .............................................................................20, 21

N.Y. Civ. Serv. Law § 80(1) .............................................................................20, 21

New York City Health and Hospitals Corporation Act, § 4(1)................................6

New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 *et. seq.*
("CHRL").................................................................................................................1, 24

New York State Human Rights Law ("SHRL")...............................................1, 11, 24

**Other Authorities**

Fourteenth Amendment............................................................................................36

FRE 702........................................................................................................*passim*

Local Rule 56.1 .........................................................................................................2

Rule 56 ........................................................................................................................1

Rule 401 ..........................................................................................................37, 38, 39

## PRELIMINARY STATEMENT

Plaintiffs commenced this action on December 13, 2018 in New York County Supreme Court. See ECF Dkt. No. 1-1. The matter was subsequently removed to federal court and Plaintiffs filed a First Amended Complaint ("FAC" or "Complaint") alleging disparate impact, disparate treatment, and pattern-or-practice discrimination based on race and/or age under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. ("ADEA"); New York State Human Rights Law ("SHRL"), N.Y. Exec. Law § 296 et seq., New York City Human Rights Law, N.Y.C. Administrative Code §§ 8-101 et seq. ("CHRL"), 42 U.S.C. § 1981 ("Section 1981") and 42 U.S.C. § 1983 ("Section 1983"), as well as state law breach of contract claims and class claims. See ECF Dkt. Nos. 1, 22. Plaintiffs thereafter moved for class certification, which was denied. See Memorandum Opinion and Order, ("Class Cert. Order") ECF Dkt. No. 79, filed September 12, 2022; see also Memorandum Opinion and Order ("Reconsideration Order"), ECF Dkt. No. 93, filed January 12, 2023. Following the completion of discovery, Plaintiffs moved for summary judgment on their claims and sought to strike Dr. Christopher Erath, Defendants' rebuttal expert. See Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion to Exclude Expert Testimony and for Partial Summary Judgment ("Pl. MOL."), filed September 12, 2023, ECF Dkt. No. 107.

Defendants City of New York ("City") and New York City Health and Hospitals Corporation d/b/a NYC Health + Hospitals ("H+H") respectfully submit this Memorandum of Law in support of their cross-motions for summary judgment pursuant to Federal Rules of Civil Procedure ("FRCP") Rule 56 and to exclude the testimony of Plaintiffs' expert witness, Dr. Shane Thompson pursuant to Federal Rule of Evidence ("FRE") 702, and in opposition to Plaintiffs' motions for summary judgment and Plaintiffs' motion to exclude the expert testimony of Dr. Erath. Specifically, Defendants seek an order precluding Plaintiffs from calling Dr. Thompson as an

- 1 -

expert witness and/or introducing evidence generated by Dr. Thompson. For the reasons explained *infra*, the Court should accept the expert rebuttal report and testimony of Defendants' expert, Dr. Erath, and grant Defendants' motion for summary judgment. For the reasons explained *infra*, Plaintiffs' instant motion for partial summary judgment should be denied, their motion to exclude the report and testimony of Dr. Erath should be denied, and Defendants' motion to exclude the reports and testimony of Plaintiffs' expert, Dr. Thompson, should be granted. Accordingly, summary judgment should be granted in favor of Defendants and the First Amended Complaint must be dismissed in its entirety.

## STATEMENT OF FACTS[1]

H+H is the largest municipal health system in the United States and serves over one million New Yorkers each year. *See* Defendants' Local Rule 56.1 Statement of Material Undisputed Material Facts, dated November 3, 2023 ("Defs. 56.1") at ¶ 1. H+H has eleven acute care facilities, including NYC Health + Hospitals/Jacobi ("Jacobi"). Id. ¶ 2. H+H's work force are classified as either Group 11 or Group 12 employees. Id. ¶ 9. Group 11 employees are management employees. Id. ¶¶ 9, 11. Group 12 employees are unionized employees subject to the terms of their respective collective bargaining agreements and are primarily frontline staff – such as nurses and clinical staff – who provide direct patient care. Id. ¶¶ 9-10.

Starting in the summer of 2015, H+H began to transform from a regional network health care facilities to one system to better meet the health care needs of New Yorkers. Id. ¶ 2. H+H's transformation included cost containment, revenue growth, and clinical transformation. Id. ¶ 5. H+H was also projected to have a budget gap of $1.8 billion by the 2020 fiscal year. Id. ¶ 4.

---

[1] Unless otherwise indicated, all references to Exhibits ("Ex.") in this Memorandum of Law refer to the documents and evidence annexed to the Rosen Declaration., November 3, 2023.

H+H set cost-saving targets of around $55 million for the 2017 fiscal year to help close the gap that needed to be met by June 20, 2017. Id. ¶¶ 7-8. This translated to the elimination of approximately 1,000 Full Time Equivalent ("FTE") positions. Id. ¶ 8.

H+H tried numerous ways to reduce staffing levels in order to achieve its cost-saving targets by the June 30, 2017 deadline, including attrition, a hiring freeze, and overtime reduction. Id. ¶¶ 6-7, 12-15. The hiring freeze applied to both Group 11 and Group 12 positions. Id. ¶ 13. H+H also hired Boston Consulting Group ("BCG") to perform an assessment of H+H's managerial structure because each of H+H's facilities had developed different and inconsistent management structures. Id. ¶¶ 16-18. H+H then created a working group to address the issues raised by the BCG report and created model Tables of Organization. Id. ¶¶ 19-20.

 In December 2016, H+H determined that it was unable to achieve the required cost-savings and needed to reduce labor costs by reducing management staff. Id. ¶¶ 21-22. This process was dubbed the Managerial Efficiency Improvement Initiative ("February MEII" or "MEII I"). Id. ¶ 23. H+H asked all acute care CEOs to evaluate their management layers to determine whether the positions were redundant, required for the facilities to perform their core functions without compromising patient safety. Id. ¶ 26, 28-32. The reduction of management layers that ultimately led to the elimination of Group 11 positions. Id. ¶ 26. However, if an employee holding a Group 11 position selected for elimination had an underlying Group 12 title, then the employee could return to the Group 12 title. Id. H+H gave each facility the discretion to choose which management positions to eliminate. Id. ¶ 33.

Prior to the managerial reductions at Jacobi, eighty-five (85) percent of Group 11 employees at Jacobi were over the age of forty. Id. ¶ 24. For MEII I, William Foley, the former Jacobi CEO, tasked Jacobi leadership to identify the positions that reported to them for possible

elimination. Id. ¶ 34. At this time, Jacobi leadership included Christopher Mastromano, then-COO of Jacobi, Dr. John Morely, Chief Medical Officer, Kathleen Garramone, Chief Financial Officer, and Suzzanne Pennacchio, Chief Nursing Officer. Id. ¶ 35. Each member of Jacobi's leadership separately reviewed the positions that reported to them and separately selected positions using different methods for inclusion in MEII I. Id. ¶¶ 35, 37-39. Foley, Mastromano, Morely, and Pennacchio are all over 40 years old. Id. ¶ 36. Pennacchio identified two Director level positions for elimination: Director of Nursing in the Staffing Office and the Director of Nursing for Women and Children's Services, held by Plaintiff LaMonica. Id. ¶¶ 39-42. In the end, Jacobi eliminated 19 positions across 17 department as part of the MEII I. Id. ¶ 44. Of the employees whose positions were selected for inclusion in MEII I, all were over the age of 40, seven were held by employees who have identified as White, six identified as Black, two identified as Asian, and four identified as Hispanic. Id. ¶¶ 45-46. Three of the employees had fallback titles and returned to their Group 12 positions. Id. ¶ 47. The positions selected for inclusion in MEII I were deemed to no longer be critical to Jacobi's operation. Id. ¶ 43.

In March 2017, H+H determined that it had fallen short of the necessary cost savings and decided to engage in a second MEII ("June MEII" or "MEII II") but with more guidance. Id. ¶ 48. For MEII II, H+H conducted an analysis of current management staffing levels at each facility and set FTE reduction targets for each facility, provided facilities with a model Table of Organization to guide the selection of managerial positions, and recommended the elimination of the Senior Associate Director title. Id. ¶¶ 51-53, 58-60, 66. However, H+H also permitted each facility to exercise its discretion in selecting managerial positions for inclusion in MEII II. Id. ¶¶ 58-59, 61-65.

MEII I and MEII II involved different people at both the H+H Central level and at the Jacobi facility level. Id. ¶ 54. At the H+H Central level, Antonio Martin, Assistant Chief Operating Officer, and Rick Gannotta, Senior Vice President for the Acute Care Service Line, were involved in the MEII I but not MEII II. Id. William Foley joined H+H Central as the Senior Vice President of Acute Care after the conclusion of the MEII I and led the MEII II with Rosa Rosa Colon-Kolacko, the Senior Vice President and Chief People Officer. Id. ¶¶ 55-56, 66.

At Jacobi, the MEII II was conducted by Mastromano, who became Jacobi's acting CEO in February 2017 and CEO in May 2017, who tasked Jacobi's leadership to review the lines of employees reporting directly to them and recommend positions for inclusion in MEII II. Id. ¶¶ 69-71. Jacobi's leadership involved in MEII II included Pennacchio, Ellen Barlis, then Associate Director of Finance, and Joan Sampson, Jacobi's HR Director. Id. ¶¶ 70-71. Each member of Jacobi's leadership chose positions without consulting each other and took different approaches. Id. ¶¶ 72-75, 82. For example, Mastramano chose positions based on a review of the title and the functions being performed by the department in which the title was located while Pennacchio chose positions in consolation with her Directors. Id. ¶¶ 75-78. Pennacchio and her Directors selected three positions for elimination - educator for ambulatory, educator for women's health, held by Plaintiff Phipps, and the Associate Director of Nursing for the Operating Room, held by Plaintiff King. Id. ¶¶ 78-81.

Ultimately, Jacobi identified 26 positions for inclusion in MEII II. Id. ¶ 87. Of the 26 positions, 2 employees were under the age of 40, 13 positions were held by employees who identified as White, ten by employees who identified as Black, one by an employee who identified as Asian, and two by employees who identified as Hispanic. Id. ¶¶ 88-89. All the positions selected

for inclusion in Jacobi's June MEII II were deemed to not impact Jacobi's operations or patient safety. Id. ¶¶ 68, 87.

## ARGUMENT

### POINT I

### DEFENDANT CITY SHOULD BE DISMISSED BECAUSE IT IS NOT A JOINT EMPLOYER WITH DEFENDANT H+H

The City should be dismissed as a defendant because it is not a joint employer with H+H. It is well established that the City and H+H are separate legal entities and the City cannot be held liable for actions by H+H staff. See, e.g., L. 1969, ch. 1016 § 1 [New York City Health and Hospitals Corporation Act, § 4(1)]; Samuel v. Bellevue Hosp. Ctr., 366 F. App'x 206, 206 n.** (2d Cir. 2010) (holding that H+H is "separate and distinct" from the City); De'Bey v City of N.Y., 2021 U.S. Dist. LEXIS 207665, at *59 (S.D.N.Y. 2021), adopted 2022 U.S. Dist. LEXIS 57388 (S.D.N.Y. 2022) (H+H and City are separate legal entities).

It is similarly well established at H+H employees are not employees of the City. See Woodard v. N.Y. Health & Hosps. Corp., 2010 U.S. Dist. LEXIS 68916, at *20 (E.D.N.Y. 2010) (citing Vaughn v. City of New York, 108 Misc. 2d 994, 998 (Sup. Ct. N.Y. Cty. 1980), aff'd 89 A.D.2d 944 (1st Dep't 1982) ("[NY CLS Unconsol, Ch. 214-A, § 5] clearly demonstrates that the Health and Hospitals Corporation was intended to function as an independent entity in every regard and was to have complete autonomy respecting its personnel. Thus plaintiff, as an employee of this independent agency, was not controlled or subject to employment conditions set by the City for its workers"). H+H has complete autonomy when it comes to staffing and personnel decisions and thus is not a joint employer with the City. See, e.g., Adams-Flores v. City of N.Y., 2020 U.S. Dist. LEXIS 37411, at *11-13 (S.D.N.Y. 2020) (J. Furman) (dismissing claims against H+H under theory as single or joint employer because H+H and Department of Corrections did not share

centralized control over personnel or employment decisions). Thus, the City and H+H are not joint employers and all claims against the City must be dismissed.

## POINT II

### PLAINTIFFS' TITLE VII AND/OR ADEA CLAIMS ARE PARTIALLY BARRED BY FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES AND/OR TIME-BARRED

Plaintiffs' respective Title VII and/or ADEA claims are partially barred by their failures to exhaust administrative remedies and/or time-barred. It is well established that a plaintiff must exhaust administrative remedies by filing a complaint with the EEOC or the equivalent agency within three hundred days of the alleged unlawful employment practice. See 42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. § 626(d); Tanvir v. N.Y.C. Health & Hosps. Corp., 480 F. App'x 620, 621 (2d Cir. 2012). Claims regarding acts that occurred more than three hundred days prior to an EEOC filing are time-barred.  See Ragone v. Atlantic Video, 595 F.3d 115, 126 (2d Cir. 2010) (Title VII). A plaintiff can raise "only those claims that either were included in or are 'reasonably related to' the allegations contained in the EEOC charge." Tanvir, 480 F. App'x at 621; Hoffman v. Williamsville Sch. Dist., 443 F. App'x 647, 649 (2d Cir. 2011).

After receiving a right to sue letter from the EEOC, a Plaintiff must then file a complaint in Court within ninety (90) days. See Ko v. JP Morgan Chase Bank, N.A., 730 Fed. App'x. 62, 63 (2d Cir. 2018). While the ADEA does not require a plaintiff to receive a right-to-sue letter before filing a lawsuit, if the EEOC does issue a right-to-sue letter for an ADEA claim, then "the claimant must file her federal suit within 90 days after receipt of the letter." Holowecki v. Fed. Express Corp., 440 F.3d 558, 563 (2d Cir. 2005); see also 29 U.S.C. § 626(e).

Plaintiff Berman jointly filed a complaint with the SDHR and EEOC alleging age and sexual orientation discrimination relating to the MEII II on August 3, 2017 and received a

right to sue letter on January 17, 2018. <u>See</u> Defs. 56.1 ¶ 91. Berman did not file the present lawsuit until December 13, 2018, two-hundred and forty days after she received her right to sue letter. <u>See</u> Defs. 56.1 ¶¶ 91, 99. Thus, Berman's sex and age discrimination claims are time-barred. To the extent that Berman is alleging race discrimination, such claims are barred by her failure to exhaust her administrative remedies with the EEOC. <u>See</u>, <u>e.g.</u>, <u>Gomez v. N.Y.C. Police Dep't</u>, 191 F. Supp. 3d 293, 299 (S.D.N.Y. 2016); <u>Hoffman</u>, 443 Fed. Appx. at 649-650; <u>Carter v. New Venture Gear, Inc.</u>, 310 Fed. Appx. 454, 458 (2d Cir. 2009).

As for the remaining Plaintiffs – Allen, Birdsong, Henry, Jacob, King, LaMonica, Phipps, Press, Richardson and Tufaro – they filed EEOC complaints on December 4, 2017. <u>See</u> Defs. 56.1 ¶ 92. Thus, any claims that accrued 300 days before – or before February 7, 2017, are time-barred. <u>See</u> Ragone, 595 F.3d at 126. Their only timely claims are those connected to their selection for the MEII I and MEII II. To the extent that Plaintiffs attempt to plead new or additional claims for the first time in their partial motion for summary judgment (<u>see</u> Pl. MOL at pg. 6-10), they may not do so. <u>See</u>, <u>e.g.</u>, <u>Thomas v. Egan</u>, 1 F. App'x 52, 54 (2d Cir. 2001) ("A claim must be set forth in the pleadings, in order to give defendants fair notice of the nature of the plaintiff's claim . . . . Thus, it is inappropriate to raise new claims for the first time in submissions in opposition to a summary judgment motion.").

As Plaintiffs Allen, Henry, Jacob, and Richardson only brough claims of race and age discrimination before the EEOC, all other claims – including gender/sex or retaliation claims – are barred by failure to exhaust administrative remedies. <u>See</u> Defs. 56.1 ¶ 93; <u>see also</u>, <u>e.g.</u>, <u>Gomez</u>, 191 F. Supp. 3d at 299; <u>Hoffman</u>, 443 Fed. Appx. at 649-650; <u>Carter</u>, 310 Fed. Appx. at 458; <u>Wright</u>, 2008 U.S. Dist. LEXIS 22567 at *7. Similarly, Plaintiffs LaMonica, Press, and Tufaro only brought claims of sex and age discrimination, and as such all other claims – including

race discrimination– are barred by failure to exhaust administrative remedies. See Defs. 56.1 ¶ 94; see also, e.g., Gomez, 191 F. Supp. 3d at 299; Hoffman, 443 Fed. Appx. at 649-650; Carter, 310 Fed. Appx. at 458; Wright, 2008 U.S. Dist. LEXIS 22567 at *7. Meanwhile, Plaintiffs Birdsong, Phipps, and King brought only claims of race, sex, and age discrimination and so any other claims are barred by failure to exhaust administrative remedies. See Defs. 56.1 ¶ 95; see also, e.g., Gomez, 191 F. Supp. 3d at 299; Hoffman, 443 Fed. Appx. at 649-650; Carter, 310 Fed. Appx. at 458; Wright, 2008 U.S. Dist. LEXIS 22567 at *7.

## POINT III

### PLAINTIFFS' BREACH OF CONTRACT CLAIM SHOULD BE DISMISSED

The Court should not only deny Plaintiff's motion for summary judgment on their breach of contract claim, but also should grant summary judgment in favor of Defendants and dismiss this claim because Plaintiffs were at-will employees of defendant H+H who were not party to any contract with either of the Defendants. Under New York law, there is generally no contractual liability in an at-will employment relationship. See Hargett v. Metro. Tr. Auth., 552 F. Supp. 2d 393, 402 (S.D.N.Y. 2008), aff'd on other grounds, 381 F. App'x 12 (2d Cir. 2010). The presumption of at-will employment in New York may be rebutted if the employee is able to show: (1) that the employer made the employee aware of an express written policy limiting its right of discharge, and (2) that the employee detrimentally relied on that policy in accepting that employment. See Baron v. Port Auth. of New York and New Jersey, 271 F.3d 81, 82 (2d Cir. 2001); see also Weiner v. McGraw-Hill, 57 N.Y.2d 458, 465-66 (1982) (using a totality of the circumstances analysis to rebut the presumption of at-will employment). Plaintiffs have failed to rebut the presumption that they were at-will.

Plaintiffs allege that H+H's handbook, EEO and HR policies, and Operating Procedure 20-39 collectively created an employment contract between Plaintiffs and Defendant H+H. See Pl. MOL at pg. 23-24. However, none of these documents created an employment contract. See, e.g., De Petris, 86 N.Y.2d 406; Hargett, 552 F. Supp. 2d at 403 (nondiscrimination policies and other general statements "do not give rise to any contract because they are inadequate as consideration"). The New York Court of Appeals has held that "[The] [m]ere existence of a written policy. . . does not limit an employer's right to discharge an at-will employee, or give rise to a legally enforceable claim by the employee against the employer." Hargett, 552 F. Supp. 2d at 403 (quoting De Petris v. Union Settlement Assoc., 86 N.Y.2d 406, 410 (1995)). "Routinely issued employee manuals, handbooks, and policy statements should not lightly be converted into binding employment agreements." Lobosco v. N.Y. Tel. Co./NYNEX, 96 N.Y.2d 312, 316 (2001)) (applying Weiner factors). Every employer in New York is obligated not to fire employees on the basis of their age or race. See Hargett, 552 F. Supp. 2d at 403. (citing N.Y. Human Rights Law § 296(1)(a) (2007), 42 U.S.C. § 1981 (2000)). Therefore, a promise to not discriminate against employees on the basis of age or race is not sufficient consideration to create an implied contract and rebut a presumption of at-will employment. Id.

Even if Operating Procedure 20-39 was an employment contract, (see Pl. MOL at pg. 24), which it was not, Operating Procedure 20-39 was rescinded on December 14, 2016, prior to the MEII I or MEII II. See Memo, from: Stanley Brezenoff, Interim President, dated: December 14, 2016, subject: Recission of Operating Procedure 20-39 ("Recission"), Ex. 28. Furthermore, the defunct Operating Procedure 20-39 expressly stated that it did not cover "[a]ctions that are a result of budget reduction, downsizing and/or loss of grant funding." See Operating Procedure No.20-39, Managerial Decisions Affecting Group 11 Employees' Status or Salary, dated April 29, 2005,

a copy of which is annexed to Declaration of Erica T. Healey-Kagan as Exhibit M, ECF Dkt. No. 106-13, at III(B)(4). The rescinded Operating Procedure 20-39 also clearly stated that Group 11 employees "have no tenure and serve at the pleasure of the President" and thus were at-will employees. Id. at IV(A). the rescinded Operating Procedure 20-39 also clarified that Group 11 employees "have no tenure and serve at the pleasure of the President" and other corporate officers, thereby emphasizing their at-will status. Id. Accordingly, there was no contract or purported contract, or operating policy on which Plaintiffs could detrimentally rely upon in place at the time Plaintiffs were selected for the MEII I or MEII II. As for Plaintiffs' allegation that Defendants were required to create and follow an "HR Separation Execution Plan" and their alleged failure to do so resulted in a breach of contract (see Pl. MOL at pg. 24), Plaintiffs have failed to show as a matter of law that H+H were legally created to create such a plan. The document to which Plaintiffs cite (see Pl. Ex. BB, ECF Dkt. No. 106-28), is a PowerPoint dated May 31, 2017, well after MEII I and thus cannot be used to invent a contract for the Plaintiffs who were part of MEII I. Plaintiffs also fail to produce any evidence that an internal PowerPoint was published or otherwise create a contract on which Plaintiffs detrimentally relied. As for the Plaintiffs whose positions were selected for MEII II, Plaintiffs have failed to show how a PowerPoint for H+H outlining the steps for the MEII II created a contract between Defendants and Plaintiffs or how the nonexistent contract was allegedly breached. Thus, Plaintiffs' breach of contract claim fails as a matter of law.

## POINT IV

## PLAINTIFFS' DISPARATE IMPACT CLAIMS SHOULD BE DISMISSED

### A.    Disparate Impact Standard

The essence of any disparate impact claim under the ADEA, Title VII, SHRL and CHRL, is that a facially neutral selection method disproportionally harms a protected class. See

Smith v. City of Jackson, 544 U.S. 288, 241 (2005); Attard v. City of N.Y., 451 F. App'x 21, 24 (2d Cir. 2011); Teasdale v. N.Y.C. Fire Dep't, 574 F. App'x 50, 52 (2d Cir. 2014). The Supreme Court has explained that it "is not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact." Smith, 544 U.S. at 241. "Rather, the employee is 'responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities.'" Id. (citation omitted). "[I]n the absence of a 'specific employment practice' pertinent across a putative class, merely pointing to 'an overall [class]-based disparity does not suffice." Richardson v. City of New York, 2021 U.S. Dist. LEXIS 90822, *23 (S.D.N.Y. 2021) (quoting Dukes, 564 U.S. at 357).

Title VII also prohibits "employers' facially neutral practices that, in fact, are discriminatory in operation." Ricci v. DeStefano, 557 U.S. 557, 577-78 (2009). To establish a *prima facie* violation, a plaintiff must show that the employer "uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin." 42 U.S.C. § 2000-e2(k)(1)(A)(i). To make out a disparate impact case, a plaintiff must: (1) identify a specific employment practice or policy; (2) demonstrate that a disparity exists; and (3) establish a causal relationship between the two." Brown v. Coach Stores, 163 F.3d 706, 712 (2d Cir. 1998); see also Gulino v. N.Y. State Educ. Dep't, 460 F.3d 361, 382 (2d Cir. N.Y. 2006), citing 42 U.S.C. § 2000e-2(k)(1). "Allegations which contend only that there is a bottom-line racial imbalance in the work force are insufficient." Id.

Moreover, plaintiffs' failure to establish causation is also fatal to their disparate impact claim. Courts will routinely dismiss disparate impact claims where plaintiffs' fail to adequately show a causal connection between any facially neutral policy and the alleged disparity. See Smith v. City of Jackson, 544 U.S. 228, 241 (2004) ("[i]t is not enough to simply allege that

there is a disparate impact on workers or point to a generalized policy that leads to such an impact. Rather, the employee is responsible for isolating and identifying the *specific* employment practices that are allegedly responsible for any observed statistical disparities"); Brown v. Coach Stores, at 712-13 (dismissing disparate impact claim where plaintiff did not connect alleged statistical disparities to a policy of the employer).

## B. Application - No Neutral Employment Policy

As an initial matter, the Court previously denied Plaintiffs' motion for class certification and motion for reconsideration based on, among other things, their failure to identify a facially neutral policy. See Class Cert. Order, ECF Dkt. No. 79. To date, Plaintiffs have still not identified a facially neutral policy. The record of devoid of evidence of the existence of any facially neutral employment practice or policy, much less one that causes a discriminatory disparity based on age or race. This alone warrants dismissal. See Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 357 (2011) ("Other than the bare existence of delegated discretion, respondents have identified no "specific employment practice"—much less one that ties all their 1.5 million claims together. Merely showing that Wal-Mart's policy of discretion has produced an overall sex-based disparity does not suffice." ).

Plaintiffs conclusorily allege that H+H had a "layoff policy". See Pl. MOL. at 18. No such policy existed. H+H did not have a policy that required Group 11 employees to be terminated or otherwise laid off. See Defs. 56.1 ¶ 23. Rather, H+H sought to standardize its managerial positions across its facilities, reduce the management layers, and increase managerial spans of control. See Defs. 56.1 ¶¶ 17-20, 26, 28-30, 50, 59, 62-63. If a Group 11 employee whose

position was selected for the MEII I or MEII II also had an underlying Group 12 title, then the employee had the option of returning to the Group 12 position. See Defs. 56.1 ¶¶ 26, 47, 90.[2]

Plaintiffs' first pointed to the MEII as the policy. See Pl. MOL at pg. 4. However, as the Court found in its decision denying class certification, MEII I and MEII II were two separate events that "differed in significant respects" – including being drafted and implemented by different individuals. See Class Cert. Order, ECF Dkt. No. 79, at 2. The Court specifically noted that the two separate MEIIs cannot be combined into one. See Class Cert. Order, ECF Dkt. No. 79, at fn. 2. As set forth above, the decision to implement MEII I and MEII II were made by different individuals at H+H, were implemented by differing individuals at Jacobi, who each only selected positions that reported to them, and had different sets of guidance. See Defs. 56.1 ¶¶ 17-88. For example, H+H Central provided Jacobi with a target number of FTEs for MEII II but not MEII I. See Defs. 56.1 ¶¶ 28, 51. Likewise, H+H Central developed a standardized table of organization that Jacobi used as a guide to select positions for MEII II but the table had not been developed in time for, and thus not used for, MEII I. See Defs. 56.1 ¶¶ 20, 51. In addition, Jacobi's leadership focused on selecting positions that reported to them and did not consult one another about positions that did not report to them. See Defs. 56.1 ¶¶ 37-40, 43, 71-78, 82-83. Each of Jacobi's leadership approached MEII I and MEII II differently. For example, Pennacchio focused on Directors in MEII I but did not consider Directors for MEII II. See Defs. 56.1 ¶¶ 40, 76. Further, Pennacchio consulted with her Directors to select positions for the MEII II. See Defs. 56.1 ¶ 77. In contrast, Mastromano did not consult with his Directors to select positions for inclusions in either MEII. See Defs. 56.1 ¶ 74.

_____

[2] For example, of the nineteen positions selected for MEII I, three employees had fallback titles and returned to their respective Group 12 roles. See Defs. 56.1 ¶ 47.

While Plaintiffs have attempted to rebrand their claims as based on the "One New York Plan" (see Pl. MOL at pg. 4), the Court has also already rejected this argument. See Reconsideration Order, ECF Dkt. No. 93. Specifically, the Court held that the "One New York Policy" is merely a "new label" that "does nothing to change the fact that, as the Court explained in its prior Opinion, Plaintiffs challenge two initiatives that are 'different in significant respects.'" Reconsideration Order, ECF Dkt. No. 93, at fn. 1. This is the law of the case. See Musacchio v. United States, 577 U.S. 237 (2016) ("when a court decides upon **a rule of law**, that decision should continue to govern the same issues in subsequent stages in the same case." ) (emphasis added); see also United States v. Tenzer, 213 F.3d 34, 39 (2d Cir. 2000) (explaining that although not binding, law of the case doctrine counsels a court against revisiting its prior rulings in subsequent stages of the same case absent cogent and compelling reasons). A court "may depart from the law of the case for 'cogent' or 'compelling' reasons including an intervening change in law, availability of new evidence, or 'the need to correct a clear error or prevent manifest injustice.'" Johnson v. Holder, 564 F.3d 95, 99-100 (2d Cir. 2009) (quoting United States v. Quintieri, 306 F.3d 1217, 1230 (2d Cir. 2002)). Plaintiffs have not shown a compelling reason, let alone clear error or manifest injustice, to challenge the Court's earlier decisions that there is no single neutral employment policy, that MEII I and MEII II cannot be combined into a single event, and that Plaintiffs' purported "One New York Policy" does not exist. Furthermore, the document which Plaintiffs cite for the alleged "One New York Plan", Plaintiffs' Exhibit C, which is a document entitled "One New York – Health Care for Our Hospitals" is not a policy, but is rather a high level description of the vision for H+H fiscal and operational problems, and goals for its transformation.[3]

---

[3] Plaintiffs also cite to their First Amended Complaint for this proposition which is wholly improper because it is full of conclusory allegations not supported by the record. See

Even if the Court finds that the managerial reductions were part of a singular policy, which they were not, such is the sort of "generalized policy" which the Supreme Court has held is not sufficient for a disparate impact claim. See Smith, 544 U.S. at 241.

   The allegations in this case are akin to those which other courts that have rejected. See, e.g., Hazen Paper Co. v. Biggins, 507 U.S. 604, 611-612 (1993) (holding that discharging employees with more experience in order to prevent pension benefits from vesting does not violate ADEA); Gilbreath v. Brookshire Grocery Co., 400 F. Supp. 3d 580, 590 (E.D. Tx. 2019) (relying on a litany of cases throughout the country and holding that "plaintiffs terminated in a layoff cannot 'point to the layoff itself as the practice that disparately impacted older workers.'"); Cerni v J.P. Morgan Sec. LLC, 208 F. Supp. 3d 533, 543 (S.D.N.Y. 2016) (collecting cases); Arciuolo v. Tomtec Inc., 2015 U.S. Dist. LEXIS 143862, at *3 (D. Conn. 2015) (dismissing ADEA disparate impact claim partly because defendants' decision to convert salaried employees to hourly-employee status was motivated by a "cost-savings"). Gilbreath is similar to this case. There, the defendant had hired a consulting firm to help to help streamline operations and to find ways to be more efficient. Id. at 584. The consulting firm recommended they eliminate unnecessary positions. Id. The head of each department was then tasked to "find[] 'the savings or decid[e] what's best for the business." Id. So too here did H+H hire a consulting firm to assist it in streamlining its operations and the consulting firm made recommendations and each facility and its respective leadership were requested to select positions not critical to the facility's core functions for elimination. See Defs. 56.1 ¶¶ 16-20, 28-30, 33-34, 43, 50, 53, 59, 63, 66, 70-71, 73-74. In granting summary judgment on the disparate impact claim, the Gilbreath court held that the defendant's

_____

Reconsideration Order, ECF Dkt. No. 93, at fn. 2 (noting that Plaintiffs' allegations in the First Amended Complaint are conclusory and thus not entitled to a presumption of truth).

"alleged cost-cutting policy underling the RIF is not the kind of test, requirement, or practice that could give rise to a disparate impact claim." <u>Gilbreath,</u> 400 F. Supp. 3d 580, at 591. Here, too, Plaintiffs have not pointed to a specific employment practice, and this reason alone warrants the dismissal of their disparate impact claim.

## C.    Application - No Statistical Disparity or Causal Connection

Plaintiffs have also failed to satisfy their burden to show that the managerial reductions had "a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices.'" <u>Teasdale v. N.Y.C. Fire Dep't</u>, 574 F. App'x 50, 52 (2d Cir. 2014). Statistical evidence alone can suffice in a disparate impact case only if it is of the kind or degree sufficient to correlate to a specific employment practice with the complained-of adverse effect. <u>See</u> <u>Watson v. Fort Worth Bank & Trust,</u> 487 U.S. 977, 991 (1988). Thus "[i]ncomplete or inapplicable analysis, simplistic percentage comparisons, and small sample sizes produce statistical analysis with little probative value." <u>New York City Transit Auth.</u> <u>V. Beazer,</u> 440 U.S. 568, 582-87 (1979).

Plaintiffs attempt to rely on their proffered expert, Dr. Thompson, to support their claim of a statistical disparity. However, as set forth below, and in Point IX, *infra*, Dr. Thompson's statistical analysis is entirely inadmissible, and offers no causal link between any alleged "disparity" and the "policies and practices." Significantly, Dr. Thompson's reports and testimony are based on a flawed analysis and thus, no conclusions can be drawn from them. Dr. Thompson testified that he miscounted the employees included in his sample size, improperly included positions that directly impacted patient care, and failed to consider numerous factors – such as department, job function, corporate job title, age, races other than Black or White, or separate MEII I and MEII II – and even though he admitted that the factors would impact his analysis. <u>See</u> Supplemental Expert Report Dr. Shane Thompson, dated September 9, 2021 ("Thompson

Supplemental Report"), Ex. 31, at I(C)(5)-(7), I(E)(12)-(13), Fig. 1-3 (included Director of Nursing in the chart); Deposition Testimony of Dr. Shane Thompson ("Thompson Dep."), dated September 28, 2021, Ex. 10, at at 66:18-21, 67:18-22 ("I would say that [the conclusions of the initial report] are based on incorrect data because of the double counting"), 68:24-69:1 ("Does the precision of those estimates get thrown out? I think that's fair to say"), 69:6-22, 76:4-7, 76:12-15, 84:8-21, 85:17-86:22, 87:9-11, 93:25-94:2, 94:20-95:6, 101:2-102:3, 103:7-104:7, 106:2-11, 107:19-21, 108:9-25, 110:25-111:25; see also Deposition Testimony of Dr. Christopher Erath, ("Erath Dep."), dated September 29, 2021, Ex. 32, at 15:13-16, 86:2-11, 88:21-90:6.

Dr. Thompson also used the wrong population for his analysis by erroneously including Group 12 employees in his analysis even though they were not eligible for managerial reduction, and erroneously included Group 11 positions that directly impacted patient care, and thus were also not considered in MEII I or MEII II. See Ex. 32, at 15:13-16, 88:21-90:6; Ex. 10, at 67:18-22; Ex. 31; see also Smith v. Xerox Corp., 196 F.3d 358, 368 (2d Cir. 1999) ("The corresponding population in a reduction-in-force situation consists of workers subject to termination."). Accordingly, Dr. Thompson's analysis is not indicative that either MEII I or MEII II had a disparate impact on workers older than forty (40) or who were not white.

Finally, even assuming that Dr. Thompson's inflated data set and assumptions were correct and appropriate, and they were not, his conclusions do not support Plaintiffs' allegations that MEII I or MEII II had a disparate impact on either (a) the selection of non-white individuals or (b) individuals 40 and over. Indeed, Dr. Thompson did not analyze whether there was a statistical significance in the selection of Group 11 positions held by white versus non-white employees. See Ex. 10, at 107:19-21, 108:9-14; see also Rebuttal Report by Dr. Christopher Erath, dated August 11, 2021, ("Erath Report"), Ex. 30, at 5. As to the selection of employees over 40

versus under 40, Dr. Thompson found this statistically significant at the "10% level," but the generally accepted level of statistical significance is at the 5% level, which Dr. Thompson even acknowledged in his original report. See Expert Report by Dr. Shane Thompson, dated May 17, 2021 ("Thompson Report"), Ex. 29, at fn. 2; Ex. 10, at 109:4-110:19; see also Smith, 196 F.3d 358 ((holding that "Courts generally consider" the 5% probability level, or about two standard deviations, "sufficient to warrant an inference of discrimination.").

### D.    Application - Legitimate Business Reason

Even if Plaintiffs could establish a disparate impact, which they cannot, Defendant H+H had a legitimate business reason for conducting the MEII I and MEII II. Namely, H+H's managerial ranks were not structured properly resulting too many managerial positions overseeing too few employees, and managerial structures which differed greatly between H+H facilities. See Defs. 56.1 ¶¶ 17-18. In addition, H+H was facing a nearly $1.8 billion dollar budget deficit by the fiscal year 2020. See Defs. 56.1 ¶ 4. Thus, to improve its ability to meet the healthcare needs of New Yorkers, H+H sought to contain costs, transform its clinical operations, and increase revenue. See Defs. 56.1 ¶¶ 3, 5. Accordingly, Plaintiffs' assertion that "Defendants offer no explanation for why managerial Group 11 employees were the only employees considered for layoffs" is disingenuous. See Pl. MOL at 20. Furthermore, H+H took several steps prior to implementing the MEII I and MEII II to try to reduce costs including through attrition, a hiring freeze, and overtime reduction. See Defs. 56.1 ¶¶ 6, 12-13, 14.

MEII I was only enacted because H+H was unable to achieve its needed cost savings for the 2017 fiscal year, which included a workforce cost savings of around $55 million. See Defs. 56.1 ¶¶ 7-8, 21-23. MEII I focused on identifying and eliminating managerial positions that were not required for the facility to perform its core operations and did not compromise patient safety or care. See Defs. 56.1 ¶¶ 29-30. All of the positions selected for MEII I were not critical

for Jacobi's operations. See Defs. 56.1 ¶¶ 40-44. MEII II was enacted because H+H was still unable to meets its financial targets. See Defs. 56.1 ¶ 48. This time, H+H conducted an analysis of management staffing levels at each facility and provided a standardized table of organization to guide the facility's decisions. See Defs. 56.1 ¶¶ 52-53, 58-59. H+H also identified the title of Senior Associate Director as a title that each facility should evaluate for elimination. See Defs. 56.1 ¶¶ 60-61. Similarly, MEII II could not adversely affect patient care or safety or compromise the facility's operational integrity. See Defs. 56.1 ¶ 63.

Plaintiffs lament that H+H did not include Group 12 employees in MEII I or MEII II. See Pl. MOL at pg. 19, 22. However, Group 12 employees are primarily front-line workers who provided direct patient care and not managers, and thus were not eligible for the managerial reductions. See Defs. 56.1 ¶¶ 9-10, 22. Group 12 employees are also unionized and thus subject to specific CBA requirements and protections of which Group 11 employees are not. See Defs. 56.1 ¶¶ 9, 11. Furthermore, prior to enacting managerial reductions, H+H implemented several other cost-saving measures that directly impacted Group 12 employees such as a hiring freeze, attrition, and overtime reduction. See Defs. 56.1 ¶¶ 12-13,14. The cost-saving measures could not be achieved merely through Group 12 efforts and thus, H+H turned to its managerial positions, which are primarily held by Group 11 employees, to eliminate redundancies and standardize its managerial structure. See Defs. 56.1 ¶¶ 22, 26, 29-30, 48, 50, 63. In addition, H+H expressly wanted to invest in its frontline staff who provide direct patient care. See Defs. 56.1 ¶ 22. Thus, reducing frontline staff would have directly contradicted that stated goal.

Plaintiffs also allege that H+H's "layoff criteria does not comply with the mandates of New York State law[.]" See Pl. MOL at 19-20 (referencing N.Y. Civ. Serv. Law §§ 65(3), 80(1)). As an initial matter, MEII I and MEII II were not layoffs or a reduction in force. MEII I

and MEII II focused on titles and not employees and focused on standardizing its managerial layers and eliminating redundant positions. Second, N.Y. Civ. Serv. Law § 65(3) is about terminating provisional appointments made pending the creation of a list for permanent appointment to a civil service title. See N.Y. Civ. Serv. Law § 65(3). Plaintiffs were not holding provisional appointments pending the creation of an appointment list to fill a vacancy and thus the statute does not apply. Similarly, N.Y. Civ. Serv. Law § 80(1) has to do with the suspension or demotion of a civil service competitive class title, of which Plaintiffs did not hold and thus does not apply. In any event, a purported violation of state law does not per se result in a federal law violation. Cf. Tooly v. Schwaller, 919 F.3d 165, 172 (2d Cir. 2019) (holding that the Second Circuit has held that "violation of state law does not per se result in a violation of the Due Process Clause.").

Plaintiffs also criticize that H+H did not utilize performance reviews or individualized employment histories when implementing MEII I or MEII II. See Pl. MOL at 20. However, H+H intentionally did not utilize performance ratings, disciplinary history, or time and attendance records because the purpose of MEII I and MEII II were to standardize its layers of management and eliminate managerial titles and positions – not individual employees or an employee's performance. See Defs. 56.1 ¶ 32. Plaintiffs have failed to produce any evidence that considering the aforementioned factors would fix H+H's management structure while resulting in a difference outcome. Furthermore, such a claim is akin to claiming that H+H permitted Jacobi's leadership to have too much discretion in picking positions to be eliminated, which is antithetical to a disparate impact claim, which requires a uniform employment practice which is uniformly applied to a group of employees.

Plaintiffs also allege that H+H specifically targeted individuals over the age of forty or based on their race. However, the record is devoid of any evidence to support these assertions.

Rather, the record shows that positions held by employees both over and under the age of 40 and of all races were considered – the entire breadth of Group 11 employees in managerial positions that did not impact patient care were considered. Of note, prior to MEII I, eighty-five (85) percent of Group 11 employees at Jacobi were over the age of 40. See Defs. 56.1 ¶ 24. In fact, in MEII II, two of the positions selected for elimination at Jacobi were held by individuals under the age of 40. See Defs. 56.1 ¶ 89.

Plaintiffs allege, in direct contraction of the record, that as part of both MEII I and MEII II, H+H made decisions "based on cost saving targets, which led them to target higher-paid employees in order to meet the target. These higher-paid employees are, on average, older than the employees, who were not terminated." See Pl. MOL at 10. However, H+H expressly did not provide facilities with target numbers in MEII I or a target dollar amount. See Defs. 56.1 ¶ 31. As for MEII II, H+H provided FTE targets but expressly did not provide dollar targets. See Defs. 56.1 ¶ 53. Either way, "[c]ourts have repeatedly held—even at the motion to dismiss stage—that 'cost-savings' actions by employers, such as terminating employees with higher salaries, are based on a reasonable factor other than age and thus do not violate the ADEA, even though such an action will likely have a disparate impact on older employees." Cerni, 208 F. Supp. 3d at 543.

## E.    Application - No Comparators

A successful disparate impact claim involves a comparison between two groups – those affected and those unaffected by the facially neutral policy. This comparison must reveal that, although neutral, the policy in question imposes a "significantly adverse or disproportionate impact" on a protected group of individuals. See Tsombanidis v. W. Haven Fire Dep't, 352 F.3d 565, 575 (2d Cir. 2003). In making out a disparate impact claim, Plaintiffs "must identify members of a protected group that are affected by the neutral policy and then identify similarly situated persons who are unaffected by the policy." See Tsombandis, 352 F.3d at 576-77. Whether someone

is "similarly situated" turns on whether the person was subject to the same workplace standards in all material respects. See Thomas v. S.E.A.L. Security, Inc., 2007 U.S. Dist. LEXIS 63841, at *18-19 (S.D.N.Y. 2007). Plaintiffs have utterly failed to present any purported comparators, let alone any that are similarly situated. Plaintiffs were Group 11 employees, or non-union managerial employees whose positions did not directly impact patient care. Thus Group 12 employees, and Group 11 employees whose positions directly impact patient care, are not proper comparators. Simply put, there are no comparators to support Plaintiffs' claim of disparate impact based on race. Furthermore, Plaintiffs Allen, Birdsong, Henry, King, Phipps, Richardson identify as Black (see Defs. 56.1 ¶¶ 102, 116, 124, 136, 150, 158), while Plaintiffs LaMonica, Press, Tufaro identify as white (see Defs. 56.1 ¶¶ 141, 151, 167), Plaintiff Jacob identifies as Asian (see Defs. 56.1 ¶ 129), and Plaintiff Berman refused to identify her race (see Defs. 56.1 ¶ 110). The diversity amongst the Plaintiffs, whose positions were all selected in either MEII I or MEII II, serves as further evidence that there was no disparate impact based on race. Plaintiffs also fail to identify purported comparators under the age of 40 and so the record is devoid of any evidence to support Plaintiffs' claim of disparate impact based on age. Accordingly, the Court should grant summary judgment on Plaintiffs' disparate impact claim.

## POINT V

### PLAINTIFFS' INTENTIONAL DISCRIMINATION CLAIMS SHOULD BE DISMISSED

A.    **Standard of Review**

In support of their age and race discrimination claims, plaintiffs claim disparate treatment with respect to their positions being selected for either the February or June MEII. Disparate treatment may be shown in one of two ways: an individual plaintiff may prove disparate treatment under the familiar burden shifting framework of McDonnell-Douglas; alternatively, a

group of plaintiffs entitled to be certified as a class, may also initiate a pattern or practice suit. United States v. City of New York, 717 F.3d 72, 82-83 (2d Cir. 2013). Plaintiffs' complaint fails to state a plausible claim for disparate treatment under either theory. At the threshold, given that class certification was denied, plaintiffs cannot proceed under a pattern and practice theory. See supra Point IV. Rather, each of the eleven Plaintiffs must individually establish disparate treatment under the burden shifting framework of McDonnell-Douglas.

        The ADEA protects workers over the age of 40 from discrimination by their employers on the basis of their age. 29 U.S.C. § 623(a).[4] Discrimination claims brought under the ADEA, Title VII, SHRL, and CHRL are analyzed using the McDonnell Douglas burden-shifting framework. See Matias v. Montefiore Med. Ctr., 2022 U.S. Dist. LEXIS 172848, at *9 (S.D.N.Y. 2022); (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973); Brown v. City of Syracuse, 673 F.3d 141, 150 (2d Cir. 2012)). To establish a prima facie case of discrimination under the ADEA, Title VII, SHRL, CHRL, or Section 1983, a plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for the employment; (3) he was subjected to an adverse employment decision or action; and (4) the adverse action occurred under circumstances that give rise to an inference of discrimination. See Ruiz v. County of Rockland, 609 F.3d 486, 491-92 (2d Cir. 2010); Lively v. WAFRA Inv. Advisory Grp., Inc., 6 F.4th 293, 302 n.3 (2d Cir. 2021). Moreover, under Section 1983 and ADEA, a plaintiff must prove that discrimination was the "but for" cause of the alleged adverse actions. See Naumovski v. Norris, 934 F. 3d 200, 213-14 (2d Cir. 2019) (Section 1983); Gross v. FBL Fin. Servs., 557 U.S. 167, 177 (2009) (ADEA).

---

[4] The SHRL protects workers eighteen years of age or older, while the CHRL protects workers of all ages. See N.Y. Exec. Law § 296(3-a); N.Y.C. Admin. Code § 8-107(1).

Under the CHRL, Plaintiffs need not show that the employment action was materially adverse; rather, "a plaintiff must simply show that she was treated differently from others in a way that was more than trivial, insubstantial or petty." Sotomayor v. City of New York, 862 F. Supp. 2d 226, 258 (E.D.N.Y. 2012). However, even under the CHRL, there must be a causal connection between Plaintiffs' protected characteristic and the adverse employment action. See Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109, 113 (2d Cir. 2013). Even under the more lenient CHRL, Plaintiffs must set forth some allegations tending to demonstrate a causal connection between their age or race, something they have failed to do. See Id. at 113.

When considering whether a plaintiff has raised an inference of discrimination by showing that he was subjected to disparate treatment, the Second Circuit has held that a plaintiff must show he was similarly situated in all material respects to the individuals with whom he seeks to compare himself. Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000) (Title VII); Varughese v. Mount Sinai Med. Ctr., 2015 U.S. Dist. LEXIS 43758, at *128-29 (S.D.N.Y. 2015), aff'd, 693 F. App'x 41 (2d Cir. 2017) (CHRL). The standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's situations where the plaintiff and the comparator were subject to the same discipline standards and engaged in comparable conduct. Graham, 230 F.3d at 40; Blige v. City Univ. of New York, 2017 U.S. Dist. LEXIS 8354 at * 27 (S.D.N.Y. 2017) ("Numerous courts within the Second Circuit have granted motions to dismiss disparate treatment claims where the complaint was entirely devoid of any details regarding the purported comparators, e.g. who they are, what their positions or responsibilities were, how their conduct compared to plaintiffs' or how they were treated differently by defendants"); Harlen Assoc. v. Inc. Vill. of Mineola, 273 F.3d 494, 499-500 n.2 (2d Cir. 2001) ("a court can properly grant summary judgment where it is clear that no reasonable jury

could find the similarly situated prong met."). Plaintiffs have failed to allege, much less identify, any purported comparators who were treated better than themselves.

If the Plaintiffs establish a *prima facie* case, a rebuttable presumption of discrimination arises and the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the employment decision. See Delaney v. Bank of Am. Corp., 766 F.3d 163, 168 (2d Cir. 2014). "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'" Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 142 (2000) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993)). If the employer articulates a non-discriminatory reason for its actions, the presumption of discrimination is rebutted and it "simply drops out of the picture." St. Mary's Honor Ctr., 509 U.S. at 510-11 (citing Tex. Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 255 (1981)). "For the case to continue, the plaintiff must then come forward with evidence that the defendant's proffered non-discriminatory reason is a mere pretext for actual discrimination. The plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons were false and that more likely than not, discrimination was the real reason for the employment action." Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000) (citations and internal quotations omitted). "[A] reason cannot be proved to be a 'pretext for discrimination' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." St. Mary's Honor Center, 509 U.S. at 515 (emphasis in original). The "ultimate burden is on the plaintiff to establish that the defendant's reason is in fact pretext for unlawful discrimination." Matias, 2022 U.S. Dist. LEXIS 172848, at *9-10 (quoting Abrams v. Dep't of Pub. Safety, 764 F.3d 244, 251 (2d Cir. 2014)).

For the reasons set forth below, none of the individual Plaintiffs satisfy the elements of their *prima facie* cases, and further fails to establish the but-for requirement or that H+H's legitimate business reasons were pretextual.

**B.    Plaintiffs Fail to Establish a *Prima Facie* Case of Disparate Treatment Based on Age**

There is no evidence that any of the Plaintiffs' ages played a role in their respective positions' selection for inclusion in MEII I or MEII II. The Second Circuit has found that discriminatory intent may be shown by "criticism of the plaintiff's performance in . . . degrading terms [referencing the protected group]; or [the employer's] invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to [the challenged actions]." Littlejohn v City of New York, 795 F.3d 297, 312 (2d Cir. 2015) (quoting Liebowitz v. Cornell Univ., 584 F.3d 487, 502 (2d Cir. 2009)). An inference of discrimination may also be drawn from "the fact that a replacement is substantially younger than the plaintiff." Magnani v. N. Shore Cent. Sch. Dist., No. 2019 U.S. Dist. LEXIS 146691, at *6 (E.D.N.Y. 2019) (quoting O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 313 (1996)). Plaintiffs can point to no such evidence. The record is devoid of any comments made regarding Plaintiffs' ages and is devoid of any purported comparators who were younger than Plaintiffs but treated better.

Further, Plaintiffs Allen, Birdsong, Henry, King, LaMonica, Press, Richardson, and Tufaro were over the age of 40 when they were hired by H+H, thereby weaking any inference of age discrimination. See, Defs. 56.1 ¶¶ 102, 105, 117, 125, 137, 142, 152, 159, 168; see also, e.g., See Spires v Metlife Group, Inc., 2019 U.S. Dist. LEXIS 160181, at *21-22 (S.D.N.Y. 2019) ("when a plaintiff was over forty years old when first hired, this substantially weakens any inference of discrimination on Defendants' part"); Whyte v. Contemporary Guidance Servs., Inc., 2004 U.S. Dist. LEXIS 12447, at *3 (S.D.N.Y. 2004) ("[P]laintiff']s conclusory allegation that

- 27 -

CGS discriminates against older employees in an effort to force them to resign is belied by plaintiff's allegation that he was hired when he was forty-three years old, and thus already a member of the protected class."); Grady v. Affiliated Cent., Inc., 130 F.3d 553, 560 (2d Cir. 1997)). Contrary to Plaintiffs' claims that MEII I and MEII II "target" older employees (see Pl. MOL at 10, 20), the record is clear that MEII I and MEII II focused on positions and not on people. See Defs. 56.1 ¶¶ 28-29, 32, 65, 72, 87. Furthermore for MEII II, two of the positions selected for elimination were held by people under the age of forty. See Defs. 56.1 ¶ 89.

Plaintiffs King and Press alleges that H+H hired unidentified "younger" employees to fulfill their jobs. See Pl. MOL at pg. 8-10.[5] However, the record is devoid of any such evidence. Plaintiff King cites to Exhibit B (ECF Dkt. No. 106-2), which their own self-serving conclusory and outdated affidavit. Such "conclusory assertions and general feelings" are not sufficient to create a genuine issue of material fact. See Waters v. Gen. Bd. of Glob. Ministries, 769 F. Supp. 2d 545, 559 (S.D.N.Y. 2011); see also Cameron v. Cmty. Aid for Retarded Child., Inc., 335 F.3d 60, 63 (2d Cir. 2003) ("Purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat summary judgment).

Moreover, Foley, Mastromano, and Pennacchio, who participated in the selection of positions for inclusion in MEII I and MEII II were over the age of 40 and thus, in the same protected age category as Plaintiffs, thereby further weaking any inference of age discrimination.

---

[5] Plaintiffs also allege that H+H reposted the Plaintiffs positions. See Pl. MOL at 10. However, the record is devoid of any evidence to support this claim. The document to which Plaintiffs' cite contain job postings for positions in departments not previously held by the respective Plaintiffs. This is also contradicted by Plaintiffs' own testimony. For example, Plaintiff Birdsong expressly testified that she is not alleging that anyone else was hired to perform her job after her position was eliminated. See Defs. 56.1 ¶ 123.

<u>See</u> Defs. 56.1 ¶ 36; 29 U.S.C. § 631(a); <u>Crowley v. Billboard Mag.</u>, 576 F. Supp. 3d 132, 143-144 (S.D.N.Y. 2021) (when the participant in employment decisions "belongs to the same protected class as the plaintiff creates a further inference against discrimination"); <u>Whitting v. Locust Valley Cent. Sch. Dist.</u>, 2012 U.S. Dist. LEXIS 152233, at *33 (E.D.N.Y. 2012) ("It is well settled that age discrimination is unlikely where the people who partake in the claimed adverse employment actions affecting a plaintiff's employment are over 40 years old.").

Accordingly, Plaintiff cannot establish a *prima facie* case of age discrimination under any of the applicable statutes because they have not – and cannot – demonstrate any circumstances giving rise to an inference of discrimination. "Although a plaintiff's burden at the *prima facie* stage is 'not onerous,' a plaintiff cannot establish a *prima facie* case with only 'purely conclusory allegations of discrimination, absent any concrete particulars.'" <u>Valentia Villetti, Faiza Jibril, M.D. v. Guidepoint Glob. LLC,</u> 2022 U.S. App. LEXIS 18651, at *7 (2d Cir. 2022) (internal citations omitted); <u>Cameron v. Cmty. Aid for Retarded Child., Inc.,</u> 335 F.3d 60, 63 (2d Cir. 2003) ("Purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat summary judgment) (quoting <u>Meiri v. Dacon</u>, 759 F.2d 989, 998 (2d Cir. 1985)).

Plaintiffs rely on the fallacy that because they belong to a protected class, it is plausible that anything negative that happened to them at work was because of their membership in that class. <u>See</u> <u>Grillo v. N.Y. City Transit Auth.</u>, 291 F.3d 231, 235 (2d Cir. 2002); <u>Varughese v. Mount Sinai Med. Ctr.</u>, 2015 U.S. Dist. LEXIS 43758 at *42 (S.D.N.Y. 2015). Plaintiffs also fails to show that their age were the but-for cause of their positions being selected for inclusion in MEII I or MEII II. Accordingly, Defendants are entitled to summary judgment as to Plaintiffs' age discrimination claims.

**C.    Plaintiffs Fail to Establish a *Prima Facie* Case of Disparate Treatment Based on Race**

Plaintiffs Allen,[6] Birdsong, Henry, King, Phipps, and Richardson identify as Black, while Jacob identifies as Asian, and allege race discrimination. See Defs. 56.1 ¶¶ 102, 116, 124, 129, 136, 150, 158; see also Pl. MOL at 22-23. However, they fail to establish an inference of discrimination. For the reasons explained supra Points IV and V(d), Plaintiffs have failed to show a pattern or practice or disparate impact claim, and have failed to produce evidence of purported comparators. As explained supra Point IV(e), Group 12 employees are not proper comparators.

The record is devoid of any evidence of racial animus in the selection of positions for inclusion in MEII I and MEII II. For MEII I, of the nineteen positions selected, thirteen were held by non-Black individuals – seven selected were white, two were Asian, and four were Hispanic. See Defs. 56.1 ¶ 45. For MEII II, of the twenty-six positions selected, sixteen were held by non-Black individuals – thirteen were white, one was Asian, and two were Hispanic. See Defs. 56.1 ¶ 88. As for Jacob, whose position was selected for MEII II, he was the only Asian employee whose position was selected for elimination, thereby weaking any inference of race discrimination. See Defs. 56.1 ¶¶ 88, 132. This is further emphasized by the fact that several of the co-Plaintiffs identify as races other than Black or Asian - LaMonica, Press, and Tufaro identify as white while Berman does not identify as any race. See Defs. 56.1 ¶¶ 112, 141, 151, 167.

Accordingly, Plaintiff cannot establish a *prima facie* case of age discrimination under any of the applicable statutes because they have not – and cannot – demonstrate any circumstances giving rise to an inference of discrimination. "Although a plaintiff's burden at the *prima facie* stage is 'not onerous,' a plaintiff cannot establish a *prima facie* case with only 'purely

---

[6] Plaintiff Allen alleges that he made undated and unspecified complaints of race and age discrimination. See Pl. MOL. at pg. 6. However, this is not supported by the record. Allen testified that he made complaints of race discrimination while at HRA in 2000 and not while at Jacobi. See Allen Dep., Ex. 4, at 27:2-28:7; Defs. 56.1 ¶¶ 104, 106.

conclusory allegations of discrimination, absent any concrete particulars.'" <u>Valentia Villetti, Faiza Jibril, M.D. v. Guidepoint Glob. LLC,</u> 2022 U.S. App. LEXIS 18651, at *7 (2d Cir. 2022) (internal citations omitted); <u>Cameron v. Cmty. Aid for Retarded Child., Inc.,</u> 335 F.3d 60, 63 (2d Cir. 2003) ("Purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat summary judgment) (quoting <u>Meiri v. Dacon,</u> 759 F.2d 989, 998 (2d Cir. 1985)).

**D.    Plaintiffs Fail to Allege a Pattern or Practice Claim**

Once again, Plaintiffs attempt to allege that there was an employment "practice" of race and/or age discrimination. <u>See</u> Pl. MOL at 21-23. However, Plaintiffs already brought this argument as part of the their motion for class certification, which was denied. <u>See</u> Class Cert. Order, ECF Dkt. No. 79; Reconsideration Order, ECF Dkt. No. 93. Specifically, the Court held that MEII I and MEII II were two separate events that "differed in significant respects" – including being drafted and implemented by different individuals. <u>See</u> Class Cert. Order, ECF Dkt. No. 79, at 2. The Court specifically noted that the two separate MEII cannot be combined into one. <u>See</u> Class Cert. Order, ECF Dkt. No. 79, at fn. 2. While Plaintiffs have attempted to rebrand their claims as based on the "One New York Plan" (<u>see</u> Pl. MOL at pg. 4), the Court has also already rejected this argument. <u>See</u> Reconsideration Order, ECF Dkt. No. 93. Specifically, the Court held that the "One New York Policy" is merely a "new label" that "does nothing to change the fact that, as the Court explained in its prior Opinion, Plaintiffs challenge two initiatives that are 'different in significant respects.'" Reconsideration Order, ECF Dkt. No. 93, at fn. 1. The Court's earlier rulings are the law of the case. <u>See</u> <u>Musacchio,</u> 577 U.S. 237; <u>see also</u> <u>Tenzer,</u> 213 F.3d at 39 (2d Cir. 2000). Thus, Plaintiffs' pattern or practice disparate treatment claim fails as a matter of law.

**E.    Defendants Had Legitimate Reasons for the Actions of Which Plaintiffs Complain and Plaintiffs Cannot Establish Pretext**

Even if Plaintiffs could establish a *prima facie* case of discrimination, Plaintiffs' claims fail because the record shows that Defendants' decision to implement the February and June MEIIs were motivated by legitimate, non-discriminatory reasons—fixing the management structure and also achieving system-wide cost savings. Defendants' burden in this regard is minimal, as they must merely provide some explanation for the actions Plaintiffs allege to be discriminatory. See Bickerstaff v. Vassar College, 196 F.3d 435, 446 (2d Cir. 1999), cert. denied, 530 U.S. 1242 (2000); Fisher v. Vassar Coll., 114 F.3d 1332, 1335 (2d Cir. 1997), cert. denied, 522 U.S. 1075 (1998) ("Any legitimate, non-discriminatory reason will rebut the presumption triggered by the prima facie case."). Neither courts nor juries are permitted to second-guess the non-discriminatory, non-retaliatory means an employer selects to achieve a legitimate business goal. See Dister v. Cont'l Group, Inc., 859 F.2d 1108, 1116 (2d Cir. 1988). Indeed, the fact-finder should not assess whether the employer's decision was erroneous or even rational, so long as the employer's actions were not taken for a discriminatory or retaliatory reason. See Wade v. New York Tel. Co., 500 F. Supp. 1170, 1176 (S.D.N.Y. 1980). The burden then shifts back to the plaintiff to raise a triable issue of fact with respect to whether Defendants' proffered reasons are pretext for discrimination. See id.

As set forth supra Point IV(d), H+H was motivated by budgetary reasons and a desire to standardize the managerial ranks across H+H facilities. Jacobi's leadership chose positions that were either redundant or not critical to Jacobi's core functions and did not negatively impact direct patient care, and not discriminatory animus. See, e.g., McPherson v. N.Y. City Dep't of Educ., 457 F.3d 211, 216 (2d. Cir. 2006) ("In a discrimination case . . . we are not interested in the truth of the allegations against Plaintiff. We are interested in what 'motivated the employer'". (citing United States Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983)

(emphasis in <u>McPherson</u>))). Plaintiffs Allen, Birdsong, LaMonica, Press and King concede that the selection of their positions was due to financial reasons and a need to cut management staff. <u>See</u> Defs. 56.1 ¶¶ 108-109, 121, 140, 144, 154, 170. This concession cuts against an inference of discrimination and further supports H+H's legitimate business reason.

Plaintiff Allen's position was selected for the June MEII II. <u>See</u> Defs. 56.1 ¶¶ 107-118. Mastromano, who oversaw Allen's department, chose positions for elimination based on a review of their title and functions being performed by the department in which the title was located. <u>See</u> Defs. 56.1 at ¶¶ 75. Plaintiff Birdsong's position was selected for MEII II. <u>See</u> Defs. 56.1 at ¶ 120. Her department was also overseen by Mastromano and her position was selected for the same reasons. <u>See</u> Defs. 56.1 at ¶¶ 75.

King's position was selected for MEII II by Pennacchio, in consultation with her Directors, because the position was duplicative of the Director of the Operating Room position. <u>See</u> Defs. 56.1 ¶¶ 77-78, 81, 139. Pennacchio selected Phipps' position as an educator, in consultation with her Directors, for inclusion in MEII II because Phipps was one of three employees s who performed similar nurse education functions in Women's Health, and Phipps' title was the only non-unionized one performing that functions, and thus it was the only position that could be selected for the MEII. <u>See</u> Defs. 56.1 ¶¶ 77-79, 148. Plaintiff Henry's position was overseen by H+H's Central Office and thus was not selected for inclusion in the MEII II by Jacobi leadership. <u>See</u> Defs. 56.1 ¶¶ 126-127. Thus, Henry's claims should be dismissed because the selection of his position was not part of Jacobi's implementation of MEII II. Jacob's position was selected for MEII II. <u>See</u> Defs. 56.1 ¶¶ 132. Richardson's position was selected for MEII I. <u>See</u> Defs. 56.1 ¶¶ 163-164. Their positions were selected for the reasons explained <u>supra</u>, namely that they were not critical to their respective facility's core functions and did not adversely impact

patient care.  Because Defendants have advanced legitimate non-discriminatory reasons for taking the aforementioned actions and Plaintiffs cannot establish pretext, the Court must grant Defendants' motion for summary judgment. See D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998).

**F.    Plaintiffs CHRL Discrimination Claims Fail**

Even under the more liberal standard for her CHRL claims, Plaintiffs have failed to make any showing, let alone a sufficient showing, of a causal link between age or racial bias and their positions' inclusion in MEII I or MEII II. For the reasons discussed above, and even based on the broad reading of the CHRL, the Court should dismiss Plaintiffs' CHRL discrimination claims. See, e.g., Mihalik, 715 F.3d at 113 (summary judgment appropriate only where "record establishes as a matter of law that a reasonable jury could not find the employer liable under any theory."); Rinaldi v. Mills, 2022 U.S. App. LEXIS 33636, at *3 (2d Cir. 2022) (dismissing CHRL claims where "Under the NYCHRL, Rinaldi need only demonstrate 'any causal link between age bias and [his] firing.' Given that Rinaldi's only evidence of such a causal link is his supervisor's stray comment, no reasonable factfinder could find that Rinaldi made this showing.").

**POINT VI**

**PLAINTIFFS' SECTION 1981 AND 1983
CLAIMS FAIL AS A MATTER OF LAW**

**A.    No Private Right of Action under Section 1981**

At the threshold, Section 1981 does not provide a separate private right of actions against state actors. See Duplan v. City of New York, 888 F.3d 612, 621 (2d Cir. 2018) (dismissing Section 1981 claims against the City of New York); Sealy v. State Univ. of N.Y., 2020 U.S. App LEXIS 34749, at *2 (2d Cir. 2020); Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 109 S. Ct. 2702, 105 L. Ed. 2d 598 (1989) (holding that Section 1983 "provides the exclusive federal damages

- 34 -

remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor"). Moreover, Section 1981 applies only to instances of racial discrimination. See Gibbs v. Metro. Transp. Auth., 2014 U.S. Dist. LEXIS 159093 at * 17 (E.D.N.Y. 2014). Thus, Plaintiffs' Section 1981 claims must be dismissed because it does not provide a separate private right of action against state actors.

**B.    Plaintiff fails to Establish <u>Monell</u> Liability as Against the City of New York or H+H**

Plaintiffs improperly seek to hold the City of New York and H+H vicariously liable for the elimination of 11 employees' H+H positions as a part of two managerial workforce reductions. Their claims fail as a matter of law because under <u>Monell</u>, a municipality may not be held liable under Section 1983 on a *respondeat superior* theory. See <u>Monell v. Dep't of Social Services</u>, 436 U.S. 658, 691 (1978); <u>Patterson</u>, 375 F.3d at 226. Rather, to establish liability under Section 1983, Plaintiffs must allege that the deprivation of their constitutionally protected rights resulted from a "policy, custom, or practice" of the municipal defendant. See <u>Patterson</u>, 375 F.3d at 226. "To allege the existence of an affirmative municipal policy, a plaintiff must make factual allegations that support a plausible inference that the constitutional violation took place pursuant either to a formal course of action officially promulgated by the municipality's governing authority or the act of a person with policymaking authority for the municipality." <u>Missel v. Cty. of Monroe</u>, 351 F. App'x 543, 545 (2d Cir. 2009) (citations omitted). In sum, "[t]he allegations [a defendant] acted pursuant to a 'policy,' without any facts suggesting the policy's existence, are plainly insufficient." <u>Id</u>. at 545-46 (citation omitted).

H+H is "a public benefit corporation. <u>Simpkins v. Bellevue Hosp.</u>, 832 F. Supp. 69, 73 (S.D.N.Y. 1993) ("The New York City Health and Hospitals Corporation is a public benefit corporation created to provide health and medical services to New York City residents pursuant to the New York City Health and Hospitals Corporation Act[.]"); <u>Mejía v. N.Y. City Health & Hosps.</u>

Corp., 2018 U.S. Dist. LEXIS 119224, at *5 (S.D.N.Y. 2018) (referring to HHC "[a]s a municipal corporation"). Accordingly, § 1983 claims brought against H+H require the same analysis under Monell. See Simpkins, 832 F. Supp. at 73.

      Here, Plaintiffs have failed to establish a single fact supporting their claims that any supposed constitutional deprivation took place pursuant to an affirmative policy promulgated by the City or H+H to allegedly violate Plaintiffs' unspecified constitutional rights. As set forth in Point I, *supra*, the City did not employ Plaintiffs at all, and thus Plaintiffs' Monell claims against the City must be dismissed. As to H+H, for the first time in their partial motion for summary judgment, Plaintiffs attempt to plead a Fourteenth Amendment equal protection claim. See Pl. MOL at 24-25. However, Plaintiffs did not bring such a claim in their First Amended Complaint and thus cannot do so now. See, generally, First Amended Complaint, ECF Dkt. No. 22; see also, e.g., Hunt-Watts v. Nassau Health Care Corp., 43 F. Supp. 3d 119, 135 (E.D.N.Y. 2014); Thomas v. Egan, 1 F. App'x at 54. As explained supra Point V(A), there was no affirmative municipal policy and the "One New York Plan" (see Pl. MOL at pg. 25) does not exist. As for H+H's managerial reductions through MEII I and MEII II, these were separate events wherein each facility had a large amount of discretion in selecting which positions to remove to eliminate redundancies and standardize the managerial structures throughout H+H. for the reasons explained supra Point V, Plaintiffs have failed to establish individualized discrimination claims.

**C.    No Evidence of Discriminatory Intent**

      A plaintiff pursuing a claimed violation of Section 1981 must show that the discrimination was intentional. See Patterson, 375 F.3d at 226; Juarez v. Northwestern Mut. Life Ins. Co., 69 F. Supp. 3d 364, 367 (S.D.N.Y. 2014) (a showing of intentional discrimination required for liability under Section 1981). For the reasons supra Points IV and V, Plaintiffs cannot

establish the requisite discriminatory intent for their Section 1981 or Section 1983 race discrimination claims.

**POINT VII**

**THE COURT SHOULD EXCLUDE THE REPORTS AND TESTIMONY OF PLAINTIFFS' EXPERT, DR. THOMPSON**

**A.    Standard for Admissibility of Expert Evidence**

"[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied[.]" United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007). Rule 702 of the Federal Rules of Evidence ("FRE"), provides that an expert witness may testify if: (a) their "specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.  In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the Supreme Court made clear the district court has a "gatekeeping" function under Rule 702. As such, it is charged with "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Id. at 597; accord Amorgianos v. Amtrak, 303 F.3d 256, 265 (2d Cir. 2002).

In Amorgianos, the Second Circuit interpreted the Supreme Court's holding in Daubert, and explained the Court looks to Rule 401 to analyze the admissibility of the proffered expert – namely "whether it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" and "whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered." 303 F.3d at 265-66 (internal citations and quotations omitted). After

- 37 -

satisfying Rule 401, the Court then looks to Rule 702. Id. Rule 702 requires the Court to decide whether the expert's testimony as to a particular matter will "help the trier of fact to understand the evidence or determine a fact in issue." Fed. R. Evid. 702.

**B.      Dr. Thompson's Reports and Testimony Should be Excluded in their Entirety**

As an initial matter, the Court should not consider Dr. Thompson's reports and testimony in connection with Plaintiffs' motion for summary judgment or at trial because Dr. Thompson offers impermissible opinions as to state of mind of Defendants and provides legal conclusions. As a general matter, experts may not offer opinions regarding state of mind, intent, or motive as part of their analysis. See Scott v. Chipotle Mexican Grill, Inc., 315 F.R.D. 33, 39, 45-46 (S.D.N.Y. 2016) (granting motion to strike portions of expert report that imputed motives to defendants and portions of expert testimony on legal argument or legal conclusions). The Second Circuit holds that while "an expert may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts." United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991). Expert testimony that "usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it," does not "aid the jury in making a decision." Id. Instead, it "undertakes to tell the jury what result to reach" and thus "attempts to substitute the expert's judgment for the jury's." United States v. Duncan, 42 F.3d 97, 101 (2d Cir. 1994).

Here, Dr. Thompson's reports tells the trier of fact exactly which legal and factual results to reach: "the age disparity between terminated and non-terminated employees did not occur by chance" (see ex. 29 at I(G)(15)) and "it is unlikely that race was *not* a factor in Defendants' decision regarding who to include in the [managerial reduction]" (see Ex. 29, at I(H)(18), I(D)(10), I(D)(11)(b)). Despite this, Dr. Thompson did not analyze to see whether MEII I or MEII II disparately affected individuals over the age of forty across Plaintiffs' respective

corporate titles or specific departments. See Ex. 10, at 101:2-19. Dr. Thompson also testified that, in his original report, he did not analyze to see whether MEII I or MEII II had a disparate impact on employees over the age of forty versus under the age of forty because "I was just doing it in my mind by age and race[.]" See Ex. 10, at 108:18-25. Dr. Thompson similarly testified that he did not analyze the data for disparities of race across job title and departments. See Ex. 10, at 101:20-22. Despite these admissions, Dr. Thompson's anticipated trial testimony assumes that there was a disparate impact based on race and age. These assumptions usurp the role of both the Court and the jury. Thus, Dr. Thompson's reports and testimony are irrelevant and must be precluded.

Even if Dr. Thompson's testimony met the threshold relevancy requirement, his testimony and reports must be precluded for the independent reason that they are unreliable. As stated in Amorgianos, a trial court must first look to the standards of Rule 401 to determine whether the expert testimony has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable." Amorgianos, 303 F.3d at 265-266. When evaluating the reliability of expert testimony, "it is critical that an expert's analysis be reliable at every step." Amorgianos, 303 F.3d at 267. "[A]ny step that renders the analysis unreliable . . . renders the expert's testimony inadmissible." Id. Dr. Thompson's anticipated testimony fails to meet this threshold.

### 1. Flawed Data

Dr. Thompson's initial report was based on a flawed analysis of the data – flaws that Dr. Thompson only discovered upon reading Dr. Erath's report. See Ex. 10, at 67:18-22; Ex. 31. However, such an excuse is not sufficient. See AmTrust N. Am., Inc v KF&B, Inc., 2020 U.S. Dist. LEXIS 170464, at *7-9 (S.D.N.Y. 2020) (partially striking the testimony of plaintiff's expert witness who did not acknowledge errors in expert report until after reading rebuttal expert report).

The purpose of an expert report "is intended to ensure that the party opposing an expert has his report, and the assumptions forming the bases for that report, before the deposition so that the deposition can be effective and counsel can develop material to probe the witness during cross-examination." Id. at *6-7. By Dr. Thompson's own admission, "I would say that [the conclusions of the initial report] are based on incorrect data because of the double counting." Ex. 10, at 67:21-22, 68:24-69:1 ("Does the precision of those estimates get thrown out? I think that's fair to say").

Another flaw in Dr. Thompson's report is his erroneous inclusion of Group 12 employees. Dr. Thompson's initial report improperly included one hundred forty-three (143) Group 12 employees. See Defs. 56.1 ¶ 182. Group 12 employees are unionized employees who primarily hold positions that provide direct patient care and thus their positions were not considered for MEII I or MEII II. See Defs. 56.1 ¶¶ 9-10. However, the MEII I and MEII II only considered non-unionized managerial Group 11 employees whose jobs did not adversely impact direct patient care or compromise the operational integrity of the organization. See Defs. 56.1 ¶¶ 11, 21-22, 30. While Dr. Thompson submitted a supplemental report to address the double counting and Group 12 inclusion, he did not do a complete revision of his initial report. The supplemental report addressed only some, but not all of the previously conducted tests, and included some different tests on the revised data. See Ex. 10, at 67:18-22, 69:6-22, 76:4-7; Ex. 31. Dr. Thompson's attempt to correct the flaws in his analysis is "too little, too late." AmTrust N. Am., 2020 U.S. Dist. LEXIS 170464, at *7. Thus, Dr. Thompson's reports and testimony are irrelevant and unreliable.

### 2. Inconsistent with Plaintiffs' Allegations

Dr. Thompson's analysis also does not reflect the allegations raised by Plaintiffs in their Complaint. In the First Amended Complaint, Plaintiffs allege that the MEII I and MEII II

"disparately affected older and non-white employees[.]" See First Amended Complaint, ECF Dkt. No. 22, a copy of which is annexed to the Declaration of Erica T. Healey-Kagan as Exhibit "A", ECF Dkt. No. 106-1, at ¶ 19. Even though Plaintiffs allege disparate impact based on race for all non-white individuals, Dr. Thompson only analyzed the data between black and non-white individuals and did not analyze the data for purported disparities between non-white (which would include Black, Asian, Hispanic, and other non-white ethnic and/or racial groups) and white individuals. See Ex. 30, at 3-5; Ex. 10, at 107:19-21, 108:9-17. When asked why he conducted an analysis of black employees but did not conduct an analysis of other non-white employees, Dr. Thompson testified "I don't know." See Ex. 10, at 107:19-21, 108:9-14. By analyzing only Black versus non-Black, Dr. Thompson skewed the analysis because he included white, Asian, Hispanic, and other non-Black racial and/or ethnic groups in the non-Black category. However, Plaintiffs are not claiming disparate impact on Black versus non-Black but rather non-white versus white. Dr. Thompson's analysis is missing a crucial step: he cannot testify as to the purported disparity between white and non-white employees or employees over the age of forty and under the age of forty. See Ex. 10, at 108:15-17. In the absence of explanatory testimony on this issue from Dr. Thompson, the jury cannot possibly understand how Dr. Thompson reached his calculations that the managerial reductions had a disparate impact based on race or age "without representations by counsel or speculation, either of which would be improper." United States v. Gupta, 747 F.3d 111, 138 (2d Cir. 2014). Given this missing "step," Dr. Thompson's testimony is unreliable and thus inadmissible. See Amorgianos, 303 F.3d at 267.

### 3. Inconsistent with MEII I and MEII II

Dr. Thompson's report fails to correctly analyze the proper populations for the positions that were under consideration for inclusion in the MEII I or MEII II and therefore should

be excluded. "The corresponding population in a reduction-in-force situation consists of workers subject to termination." Smith v. Xerox Corp., 196 F.3d 358, 368 (2d Cir. 1999). Here, Dr. Thompson did not include the appropriate pool of employees for consideration. Dr. Thompson testified that he did not include Group 11 employees who were hired between MEII I and MEII II, unless their position was selected for elimination in MEII II. See Ex. 10, at 84:8-21, 85:17-86:13, 106:2-11. Dr. Thompson also did not include Group 11 employees who left their employment of their own accord between MEII I and MEII II for reasons unrelated to the managerial reductions. Id. Dr. Thompson's analysis included Group 11 employees who provided direct patient care even though such positions were expressly not considered for MEII I or MEII II. See Defs. 56.1 ¶¶ 11, 22; Ex. 31, at Fig. 1-3 (included Director of Nursing in the chart).

In addition, in his initial report, Dr. Thompson included Group 12 employees in his data analysis even though they were also expressly not considered for MEII I or MEII II and so he had to redo his report excluding the Group 12 employees. See Defs. 56.1 ¶¶ 15, 26; Ex. 30, at 2; Ex. 32, at 86:2-11; Ex. 31, at I(C)(7), I(E)(12); Ex. 10, at 66:18-21, 67:18-22. Dr. Thompson studied a population that included positions that were not eligible for consideration in the MEII I and MEII II and excluded positions that were eligible. This resulted in Dr. Thompson studying the improper population which skewed his results and make his analysis unreliable.

Furthermore, Dr. Thompson acknowledged that different job titles may have different disparities in age and race. See Ex. 10, at 94:20-23. However, even though he had access to the data, Dr. Thompson failed to perform any analysis of whether there was a statistical significance within each job title or employee department based on race or age. See Ex. 10, at 76:12-15, 101:23-102:3, 110:25-111:25. Dr. Thompson conceded that in his original report, he did not analyze the data for employees over forty years old versus under forty years old. See Ex. 10,

at 108:18-25. Dr. Thompson also assumed that the likelihood of selection for managerial reduction was the same across all corporate titles. See Ex. 10, at 93:25-94:2. However, Dr. Thompson's analysis does not reflect the actual selection process. Jacobi leadership had to look beyond the standard corporate titles to the actual functions of the position in order to determine if their current positions fit into the standard table of organization. See Defs. 56.1 ¶¶ 38, 72. Dr. Thompson's failure to analyze the data beyond the corporate title to consider the nuances of job function renders his data unreliable and therefore inadmissible.

Another significant missing step in Dr. Thompson's analysis is his treatment of MEII I and MEII II as one cohesive event instead of two separate events even though he lacked any evidence to support his inaccurate assumption that the managerial reductions were the same. See Class Cert. Order, ECF Dkt. No. 79 at 2 (noting that the MEII held in February 2017 and June 2017 were two separate events); Ex. 10, at 103:7-104:7. However, the decision to implement MEII I and MEII II were made by different individuals at H+H Central Office, were implemented by differing individuals at Jacobi, who each only selected positions that reported to them, and had different sets of guidance. See Defs. 56.1 ¶¶ 27-29, 33, 35, 37, 39, 52, 54-56, 59, 62, 65-66, 70-78, 82; Ex. 3; Ex. 11.

Furthermore, despite excluding some Group 11 positions from his analysis, Dr. Thompson also assumed that all employees "would have been subject to both [managerial reductions]." See Ex. 10, at 86:8-9, 86:19-22. Once again, Dr. Thompson's analysis does not reflect the actual selection process for either MEII I or MEII II. For example, H+H did not develop the standard table of organization in time for, or used as guidance for, MEII I, but did so for MEII II. See Defs. 56.1 ¶ 51. In addition, for MEII II, H+H instructed Jacobi as to the reduction target of FTEs that the facility needed to accomplish. See Defs. 56.1 ¶ 53. By way of further example,

for MEII I, Chief Nursing Officer Pennacchio looked to the nursing table of organization and selected Director positions based on her personal knowledge of the functional duties of the managerial nursing titles. See Defs. 56.1 ¶¶ 39-42. Meanwhile, for the MEII II, Pennacchio did not consider Director positions and instead had her Directors recommend selection positions for the MEII II. See Defs. 56.1 ¶¶ 76-78. All the aforementioned missing steps, Dr. Thompson's testimony and reports are unreliable and therefore inadmissible. See Amorgianos, 303 F.3d at 267.

### 4. No Reliable Methods or Principles

Dr. Thompson's reports and testimony should be excluded because they are neither based on reliable principles or methods, nor do they consist of scientific, technical or otherwise specialized knowledge that would help a would help the factfinder to understand the evidence or facts in the case. See FRE 702; Daubert, 509 U.S. 579. Dr. Thompson's original report is unreliable because it only refers to the testing results and does not reference the methodology used to formulate his opinions. See Ex. 29; see also, e.g., yman Good Dietary Supplements Litig., 2019 U.S. Dist. LEXIS 189974, at *16 (S.D.N.Y. 2019). At his deposition, Dr. Thompson testified, "to be honest, I was just doing it in my mind by age and race…black versus non-black." See Ex. 10, at 108:18-25. Without evidence regarding how the assumption/instruction upon which Dr. Thompson's calculations are based, Dr. Thompson's calculations are inherently unreliable because they are based on nothing more than the conclusory statements of counsel. See Supply & Bldg. Co. v. Estee Lauder Int'l, Inc., 2001 U.S. Dist. LEXIS 20737 at *4 (S.D.N.Y. 2001) (expert's assumptions "based on conclusory statements of the expert's client, rather than on the expert's independent evaluation are not reasonable."). It is clear that Dr. Thompson's assumptions, and therefore his anticipated testimony, are based on Plaintiffs' counsel's assessment of their case and not on any independent evaluation conducted by him. See Arista Records LLC v. Usenet.com,

Inc., 608 F. Supp. 2d 409, 429 (S.D.N.Y. 2009) ("An expert who simply repeats the hearsay of the client who retained him, without any independent investigation or analysis, does not assist the trier of fact in understanding matters that require specialized knowledge.").

By way of further example, in his initial report, Dr. Thompson stated that he conducted a "two sample test of proportions" but did not identify the "test" he used. See Ex. 29 at (I)(H)(16); Ex. 32, at 78:2-10. "As a result, there is no way for the Court to "undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." Amorgianos, 303 F.3d at 267. Dr. Thompson found statistical significant at the "10% level," even though the generally accepted level of statistical significance is at the 5% level, which Dr. Thompson even acknowledged in his original report. See Pl. Ex. 29, fn. 2; Ex. 10 at 109:4-110:19; see also Smith, 196 F.3d 358 ((holding that "Courts generally consider" the 5% probability level, or about two standard deviations, "sufficient to warrant an inference of discrimination."). Because each of Dr. Thompson's proposed opinions are not based on reliable data or reliable methodology, his proffered testimony is inadmissible. See yman Good Dietary Supplements Litig., 2019 U.S. Dist. LEXIS 189974 at *18; Nook v. Long Island R. Co., 190 F.Supp.2d 639, 642 (S.D.N.Y. 2002) (excluding expert testimony where there existed "[n]o data, testing methodology or empirical evidence [was] offered to support [the expert's] conclusions").

## 5.  **No Probative Value**

Statistical evidence maybe be sufficient in a disparate impact case only if it is of the kind or degree sufficient to correlate to a specific employment practice with the complained-of adverse effect. Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 991 (1988). Thus "[i]ncomplete or inapplicable analysis, simplistic percentage comparisons, and small sample sizes

produce statistical analysis with little probative value." <u>New York City Transit Auth. v. Beazer</u>, 440 U.S. 568, 582-87 (1979). Dr. Thompson's statistical analysis offers no causal link between race or age and the MEII I or MEII II. As explained *supra*, Dr. Thompson's reports rely on flawed population and failed to accurate analyze the actual allegations of the Plaintiffs. Plaintiffs attempt to handwave away these significant issues, and insist that even though the population was flawed, Dr. Thompson still reached the correct outcome. <u>See</u> Pl. MOL at 16. Courts in this Circuit have previously rejected this logic and should do so here. <u>See</u>, <u>e.g.</u>, <u>AmTrust N. Am., Inc v. KF&B, Inc.</u>, 2020 U.S. Dist. LEXIS 170464, at *5 (S.D.N.Y. 2020) (court rejected proffered expert's assertion that he reached the right conclusion despite data errors). The fact remains that Dr. Thompson's initial and rebuttal reports are woefully inadequate and Dr. Thompson was unable to justify or rectify these flaws in his deposition testimony. As such, Dr. Thompson's calculations lack proper evidentiary basis and are unreliable. Accordingly, the Court should exclude the reports and testimony of Dr. Thompson.

**POINT VIII**

**THE REPORT AND TESTIMONY OF DEFENDANTS' EXPERT, DR. ERATH, SHOULD NOT BE EXCLUDED**

Plaintiffs argue that Dr. Erath's expert report and testimony illustrating the flaws in Dr. Thompson's reports should be excluded because it does not meet the requirements of FRE 702. <u>See</u> Pl. MOL at 11.[7]

---

[7] Of note, Defendants previously relied on Dr. Erath in their opposition to Plaintiffs' motion for class certification. <u>See</u> Memorandum of Law in Opposition, ECF Dkt. No. 75, filed March 17, 2022. Plaintiff did not object to Defendants proffering Dr. Erath's report at the class certification stage. <u>See</u> ECF Dkt. Nos. 71, 77.

"The function of rebuttal evidence is to explain or rebut evidence offered by an opponent." Olutosin v. Gunsett, 2019 U.S. Dist. LEXIS 189289, at *35-36 (S.D.N.Y. 2019) (quoting United States v. Tejada, 956 F.2d 1256, 1266 (2d Cir. 1992), cert. denied, 506 U.S. 841 (1992)). Due to the "flexible concept" of rebuttal, "trial judges are uniquely situated to assess the impact certain evidence or arguments have made on a jury." United States v. Barrow, 400 F.3d 109, 120 (2d Cir. 2005). Thus, the district court has "wide discretion in determining whether to permit evidence on rebuttal." Olutosin v Gunsett, 2019 U.S. Dist. LEXIS 189289, at *36 (S.D.N.Y. 2019) (declining to rule on permissibility of a rebuttal witness because such a decision required speculation of what testimony would occur at the trial that would necessitate a rebuttal witness).

Plaintiffs take umbrage at Dr. Erath's claimed lack of statistical analysis or methodology to support his rebuttal. See Pl. MOL at 13. However, in a rebuttal report, Defendants have "no burden to produce models or methods of their own; they need only attack those of the plaintiffs' experts." Scott v. Chipotle Mexican Grill, Inc., 315 F.R.D. 33, 44 (S.D.N.Y. 2016) (denying motion to strike rebuttal expert) (quoting In re Zyprexa Prods. Liab. Litig., 489 F. Supp. 2d 230, 285 (E.D.N.Y. 2007)); Luitpold Pharms., Inc. v. ED. Geistlich Sohne A.G. Fur Chemische Industries, 2015 U.S. Dist. LEXIS 123591, at *12 (S.D.N.Y. 2015) ("There is no requirement that a rebuttal expert himself offer a competing analysis; his opinions may properly concern criticizing that presented by another party."). The purpose of Dr. Erath's report is to critique Dr. Thompson's methodologies and conclusions, and by pointing to error and oversights – as to which, notably, Dr. Thompson later admitted and had to attempt to modify – he did just that.

Plaintiffs attempt to claim that Dr. Erath's rebuttal report is "speculative" (see Pl. MOL at 13), but it is not – it points precisely to factors that Dr. Thompson again overlooked in his analysis. Dr. Erath is not required to correct Dr. Thompson's work for him. See Scott, 315 F.R.D.

at 44; <u>Luitpold Pharms,</u> 2015 U.S. Dist. LEXIS 123591 at *12. Plaintiffs will have the ability to cross-examine Dr. Erath at trial and can cross-examine him "about his methodologies and conclusions regarding the ... data." <u>Scott</u>, 315 F.R.D. at 51; <u>see also</u> <u>Scott v. City of N.Y.</u>, 591 F. Supp. 2d 554, 559 (S.D.N.Y. 2008) (noting that plaintiffs can cross-examine Dr. Erath on his results). Thus, Dr. Erath's lack of competing methodologies or statistical analysis does not compel his exclusion. <u>See</u>, <u>e.g.</u>, <u>Scott</u>, 315 F.R.D. at 51 (denying motion to strike rebuttal expert); <u>Joffe v. King & Spalding LLP</u>, 2019 U.S. Dist. LEXIS 163671, at *42 (S.D.N.Y. 2019).

As a rebuttal expert, Dr. Erath merely needs to "meet <u>Daubert</u>'s threshold standards regarding the qualifications of the expert, sufficiency of the data, reliability of the methodology, and relevance of the testimony." <u>Scott</u>, 315 F.R.D. at 44. Dr. Erath easily meets the <u>Daubert</u> threshold. Dr. Erath has previously been expected by this Court as an expert. <u>See</u>, <u>e.g.</u>, <u>Scott v. City of N.Y.</u>, 591 F. Supp. 2d 554, 558-559 (S.D.N.Y. 2008) (denying motion to exclude Dr. Erath); <u>Local 3621 v. City of N.Y.</u>, 2022 U.S. Dist. LEXIS 212218 (S.D.N.Y. 2022) (utilizing expert reports to issue decision on motion for class certification)[8]; <u>Drayton v. City of N.Y.</u>, 2023 U.S. Dist. LEXIS 85769 (S.D.N.Y. 2023); <u>Serin v. N. Leasing Sys.</u>, 2010 U.S. Dist. LEXIS 142704 (S.D.N.Y. 2010) (denying motion to strike Dr. Erath as a rebuttal witness).

Dr. Erath's rebuttal goes directly to the central issue on summary judgment as to whether the MEII I and MEII II had a disparate impact on Group 11 employees on the basis of race and age. Dr. Erath's rebuttal report and testimony are exactly what FRE 702 contemplates: (a) he provides the Court with "specialized knowledge that will help the trier of fact . . . to determine a fact in issue" (FRE 702(a)) – namely, Dr. Erath uses his expertise in labor economics

---

[8]A later motion to disqualify Dr. Erath as an expert was denied. <u>See</u> <u>Local 3621, Ems Officers Union v. City of N.Y.</u>, 2021 U.S. Dist. LEXIS 104810, at *18 (S.D.N.Y. 2021), <u>adopted</u> 2021 U.S. Dist. LEXIS 126420 (S.D.N.Y. 2021).

to analyze plaintiffs' theory that the MEII I and MEII II had a disparate impact across race and age; (b) his testimony is "based on sufficient facts [and] data" (FRE 702(b)) – namely, the data produced in this case relating to MEII I and MEII II; (c) his "testimony is the product of reliable principles and methods" (FRE 702(c)) – indeed, Dr. Thompson agreed with several of Dr. Erath's points (see, e.g., Ex. 10, at 67:21-22, 68:24-69:1, 91:14-23, 92:17-24); and (d) Dr. Erath has "reliably applied the principles and methods to the facts of the case" (FRE 702(d)) – again, Dr. Thompson agreed with several of Dr. Erath's points.

Dr. Erath worked from Plaintiffs' assumptions and testified that, upon initially reviewing Dr. Thompson's initial report, he was unable to replicate Dr. Thompsons test results – which led to the discovery that Dr. Thompson used incorrect data. See Ex. 32, at 74:11-17. Moreover, Plaintiffs' expert, Dr. Thompson agreed that his initial report used incorrect data. See, e.g., x. 10, at 67:21-22, 68:24-69:1, 103:7-104:7, 107:19-21, 108:9-17. Dr. Erath's testimony takes the detailed data produced in this case and analyses whether it is consistent with Plaintiffs' theory that the managerial reductions at Jacobi had a disparate impact based on race and age (and concludes that it did not). Notably, Dr. Erath does not draw his own conclusion, or attempt to impute anything upon the Court—he merely uses his expertise to test Plaintiffs' theory in a way that will assist the Court in evaluating the ultimate question: whether the MEII I and MEII II at Jacobi had a disparate impact based on race and age amongst managerial employees at Jacobi. This falls squarely within the role and expectations of a rebuttal expert.

Dr. Erath's rebuttal report and testimony included the data and other information he considered when forming his opinion as to the flaws in Dr. Thompson's initial report, which is all that is required in a rebuttal report. See, generally, Ex. 30; see also, e.g., Scott, 591 F. Supp. 2d at 559. Dr. Erath's rebuttal report illustrates the flaws in Dr. Thompson's report through the

example of the Senior Associate Director title. See Ex. 30, at 5-6; Ex. 10, at 91:14-23, 92:17-24. While Dr. Erath did not address each and every variable, his example analysis of the Senior Associate Director title is sufficient. See, e.g., Scott, 591 F. Supp. 2d at 559 (noting that while Dr. Erath did not include all variables in his rebuttal report, it did not invalidate Dr. Erath's conclusions regarding the specific variable addressed in the rebuttal report and that the information provided by Dr. Erath was sufficient for plaintiffs to replicate Dr. Erath's theory). Of note, Dr. Thompson, Plaintiff's expert agreed with Dr. Erath's analysis of the Senior Associate Director position. See Ex. 10, at 91:14-23, 92:17-24.

As for Plaintiffs' other issues with Dr. Erath's report, namely alleging that Dr. Erath's report is "irrelevant and unhelpful to the fact finder" (see Pl. MOL at 15), Plaintiffs' own expert, Dr. Thompson, acknowledged that his original report was flawed. Specifically, Dr. Thompson conceded that he double-counted nearly all Group 11 employees, improperly included one hundred forty-three (143) Group 12 employees, excluded employees who were either hired or who voluntarily left their employment between MEII I and MEII II, treated MEII I and MEII II as a single event, and did not consider whether employees in the sample size had a title change between MEII I and MEII II or the employees' departments. See Ex. 31 at I(C)(6)-(7), I(E)(12); Ex. 10,  at 66:18-21, 67:21-22, 68:24-69:1, 76:12-15, 84:8-21, 85:17-86:22, 87:9-11, 93:25-94:2, 101:23-102:3, 103:7-104:7, 106:2-11, 110:25-111:25; Ex. 30, at 2; Ex. 32, at 86:2-11. All of these issues were raised in Dr. Erath's rebuttal report, thereby showing that his rebuttal report is directly relevant. Thus, the probative value of Dr. Erath's  rebuttal testimony outweighs any other risks. See, e.g., Scott, 591 F. Supp. 2d at 559. Therefore, Plaintiffs' motion to exclude Dr. Erath's rebuttal report and testimony should be denied.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court issue an order granting their motion for summary judgment and motion to strike Dr. Thompson, deny Plaintiffs' motion for summary judgment and motion to strike Dr. Erath, dismissing Plaintiffs' claims in their entirety, with prejudice, and awarding Defendants such other and further relief as the Court deems just and proper.

Dated:          New York, New York
                November 3, 2023

                                    **HON. SYLVIA O. HINDS-RADIX**
                                    Corporation Counsel of the City of New York
                                    Attorney for Defendants
                                    100 Church Street, Room 2-316
                                    New York, New York 10007

                                    By: /s/            Elisheva L. Rosen
                                                Elisheva L. Rosen
                                                Assistant Corporation Counsel